

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
FEB 1 5 2001
2001 FEB 15 PM 4: 16
LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SEACOR MARINE, INC. AND SEACOR OFFSHORE, INC. | * | CIVIL ACTION |
| | * | |
| | * | NO.:   00-0166 |
| **Plaintiffs** | * | |
| | * | SECTION:  "S" (1) |
| VERSUS | * | |
| | * | |
| HOUMA FABRICATORS, A DIVISION OF L.O.R., INC., AIR COMPRESSOR ENERGY SYSTEMS, INC., DRESSER INDUSTRIES, INC. , AND LEROI INTERNATIONAL, INC. D/B/A COMPAIR  LEROI | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| **Defendant** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OF SEACOR IN OPPOSITION TO LEROI'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This memorandum is respectfully submitted by SEACOR in opposition to LeRoi's

motions for partial summary judgment.

As shown below, the motions should be denied for three, independent reasons:

1

(1)     They ignore that fire damage was done to at least one major piece of engine room machinery (the stern thruster engine) that was purchased separately by SEACOR, and hence was not part of the "product itself," rendering *East River* inapplicable;

(2)     LeRoi just three weeks ago supplemented its discovery responses with documents suggesting that the hose-oil compatibility problem did not extend to the LeRoi SSL-50 oil used aboard the GALAXIE, and SEACOR is entitled to conduct follow-up discovery to test this suggestion – particularly since LeRoi's newly-produced documents are not verified in any way and do not constitute proper summary judgment evidence;

(3)     LeRoi errs in stating that SEACOR's only contention is that a hose-oil incompatibility problem was the source of the fire. Indeed, there is evidence from LeRoi's own witness regarding a temperature deficiency in the hose that LeRoi apparently learned of *after* the sale of the compressor, making LeRoi susceptible to tort claims under the *Miller Industries* exception to *East River*.

### A. *Summary Judgment Standards*

The party moving for summary judgment has the burden of clearly establishing the lack of triable issue of fact by the record properly before the Court. The movant's papers are carefully scrutinized; and those of the opposing party are to be indulgently regarded. See, e.g., *Bishop v. Wood*, 426 US 341, 96 S.Ct. 2074 (1976); *Moore's Federal Rules Pamphlet* ¶ 56.3[14] (1999 Ed.).

It is not the function of the trial court to resolve by summary judgment any genuine factual issues. All factual inferences are to be made against the movant and in favor of the opponent; indeed, summary judgment is not even proper when there are undisputed facts from which reasonable minds might draw different inferences. See, e.g., *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196 (2nd Cir. 1995); *Moore's Federal Practice* §56.11[5] (Mathew

2

Bender 3rd Ed.).

On summary judgment "the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold*, 369 US 654, 655, 82 S.Ct. 993 (1962).

## B. *Because the Damaged Stern Thruster Was Not Part of the "Product Itself," East River Does Not Apply*

The maritime jurisprudence establishes that when owner-supplied equipment – that is, equipment purchased separately by a shipowner from a third party rather than from the vessel's manufacturer – is damaged in a shipboard fire, the shipowner may bring a tort claim for damage to that equipment regardless of *East River*.

In *Saratoga Fishing Company v. J.M. Martinac & Co.*, 520 U.S. 875, 876, 117 S.Ct. 1783, 1785 (1997), the Supreme Court held that fire damage to equipment (a skiff, a fishing net, and spare parts) added to a vessel by its purchaser was recoverable irrespective of *East River*. In so ruling, the court wrote: "Items added to the product by the initial user are 'other property.'" *Id.* Like the skiff, fishing net and spare parts in *Saratoga Fishing*, the stern thruster here was an item added to the vessel by purchaser SEACOR and was not a component supplied by manufacturer Houma under the Shipbuilding Contract. The stern thruster engine accordingly constitutes "other property" beyond the pale of *East River*.

Of similar effect is *Nicor Supply Ships Assoc. v. General Motors Corp.*, 875 F.2d 501 (5th Cir. 1989). There the Fifth Circuit held that a ship charterer who had added seismic equipment to the ship could recover for its fire loss caused by a defective engine. As the

Fifth Circuit noted, "because these items were *not part of the contract under which the vessel was sold,* damage to them is an injury which their proprietor may recover in tort." *Nicor*, 876 F.2d at 506 (emphasis added). Here, as well, the damaged stern thruster engine was not provided by Houma under the contract, and damage to it therefore is recoverable in tort.

As these cases illustrate, the "product itself" consists of that which was sold by the seller/manufacturer (Houma Fabricators) – *not* equipment purchased separately by the buyer and integrated into the product.

The uncontroverted evidence establishes here that the GALAXIE's stern thruster engine, which was damaged in the fire, was purchased separately by SEACOR from a third party and was not sold or supplied by Houma under the Shipbuilding Contract. As Houma's president, Butch Monnier, testified in deposition:

> Q:    In looking at the photographs of fire-damaged equipment, have you observed any equipment on those photographs that you know to have been provided by Waveland [SEACOR's predecessor-in-interest under the contract] or SEACOR?
>
> A:    Yes.
>
> Q:    Please tell me what damaged equipment from those fire photos you're referring to.
>
> A:    Stern thruster engine.
>
>       ...
>
> Q:    Okay. And it's your understanding that that stern thruster engine was paid for separately by Waveland/SEACOR.

A:     Yes.

[See *Monnier Deposition,* pp. 189-91 (attached as Exhibit "A")].

Because the stern thruster engine was not supplied by Houma under the Shipbuilding Contract, but was rather purchased separately by SEACOR, it constitutes "other property" beyond the scope of *East River.*

This makes sense in light of *East River*'s chief public policy rationale: that purchasers need no tort remedy since a contract remedy will lie against the seller under the contract of sale. Because a contract remedy would not lie against Houma for a defect in the stern thruster engine that it did not sell, *East River*'s main policy justification is inapposite here, and this further supports the view that the stern thruster was "other property" beyond the scope of *East River.*

Despite diligent research, we have found no case holding to the contrary. Specifically, we have found no maritime case holding that such separately-purchased property constitutes "the product itself" (instead of "other property") for purposes of the economic loss rule. We know for a fact that Houma did *not* supply the stern thruster as part of its contractual obligations; it was purchased separately by SEACOR from a third-party. The stern thruster therefore constitutes "other property" immune from *East River.*

What LeRoi seeks is an unprecedented expansion of *East River* to bar claims for damage to property that was not even purchased from the seller/manufacturer. This should not be countenanced, and for this reason alone LeRoi's motion should be denied.

### C. *Hose Temperature Deficiency*

LeRoi seeks summary judgment on the ground that SEACOR's only theory as to how the hose was defective was an alleged hose-oil compatibility problem, which, it contends, has been disproven by its supplementary document production a couple of weeks ago. LeRoi is incorrect.

Even if there was no hose-oil compatibility problem (as SEACOR is surely entitled to confirm through follow-up discovery), there were other deficiencies relating to the hose of which LeRoi apparently became aware after placing the hose in the stream of commerce. In particular, there was testimony from LeRoi's own witness, Ron Keen, that the Gates C5C hose (i.e. the hose believed to have been on the GALAXIE at the time of the fire) lacked the necessary temperature rating to meet the industry specification for this application. As with the potential hose-oil compatibility problem, this temperature deficiency also would fit within the *Miller Industries* exception to *East River*, provided LeRoi learned of the deficiency after selling the compressor but yet failed to advise its customers of the deficiency prior to the fire.

The testimony of LeRoi's own Ron Keen suggests this was the case. Mr. Keen, who is the director of engineering at LeRoi and has degrees in engineering mechanics and materials, testified in deposition that he learned of a temperature-rating problem with the Gates C5C hose even *before* he learned of a potential oil-hose compatibility problem. [See *Ron Keen Deposition*, 4-5, 73-74, 65-66 (Exhibit "B"]. As Keen testified:

6

But the problem with the Gates [hose] was it didn't meet the spec. It wasn't the right hose for the spec.

MR. WALLACE: Let the record reflect the witness was pointing to the temperature.

WITNESS: Not the right temperature, and it doesn't meet the J, excuse me, SAE J1402 spec.

\*\*\*

Q:    And was it a compatibility problem that was the reason that the hose did not meet the SAE J1402 spec?

\*\*\*

A:    That's partial. The main driver *in the beginning* was the temperature rating. That was the main concern, the flag that went up. [*Id.* at 65-66].

At another time during his deposition Mr. Keen confirmed that he learned of the temperature concern before the hose-oil compatibility issue, stating: "... I don't ever recall compatibility being an issue until – because as I state, again, *my first look at the thing* was a comparison of the specs, *seeing the temperature concern.*" [*Id.* at 73].

Keen further explained that, for a hose to meet the applicable SAE J1402 specification, it must be rated for temperatures up to 300°F or 250°F in air. [*Id.* at 53]. A hose used in LeRoi's compressor must meet this specification, Keen noted, because "the compressors shut down at 235°F. That's why the need for the 300°F spec." [*Id.* at 54]. Confirming that the Gates C5C hose did not meet this specification, Keen testified that he believes this hose is rated only for temperatures up to 212°F or 160°F in air. [*Id.* at 69].

7

Keen further testified that the Gates C5C hose was used in applications calling for, in LeRoi terminology, a 73-951 series hose:

> Q:    To your knowledge, was the Gates C5C hose used in applications calling for a 73-951 series hose?
>
> A:    Yeah. Yes, it was. [*Id.* at 107].

Nevertheless, Keen admitted that the Gates C5C hose did not meet the relevant specification and so should not have been used in applications calling for the 73-951 series hose:

> Q:    Is the Gates C5C hose one that fits the description of the LeRoi product no. 73-951 series?
>
> A:    No... that doesn't meet the spec. By reading their [i.e. Gates'] literature and by their own admission it doesn't meet the spec. [*Id.* at 106].

Thus, by the admission of LeRoi's own director of engineering, the variety of hose that we believe triggered the GALAXIE fire did not meet LeRoi's own requirements or the relevant industry specification for temperature. What is more, Keen testified that he learned of this temperature problem before he learned of the hose-oil compatibility issue. Since we know that the hose-oil compatibility issue was discussed in a July 1998 meeting[1] – approximately six months before the GALAXIE fire of January 1999 – Keen's testimony strongly suggests that LeRoi learned of this deficiency after manufacture but in ample time to alert its customers. It's failure to do so constitutes negligence that is actionable under the *Miller Industries* case, irrespective of *East River*.

---

[1]  Roger Hart, the president of LeRoi's distributor Hart Industries, testified that information about the compatibility problem was presented to LeRoi "at least as early as this July 1998 meeting." [*Hart Deposition*, 49-50 (Exhibit "C")].

8

For the foregoing reasons, SEACOR respectfully submits that LeRoi's motions for summary judgment and partial summary judgment should be denied.

Respectfully submitted:

HARRIS & RUFTY, L.L.C.

RUFUS C. HARRIS III (#6638)
ALFRED J. RUFTY III (#19990)
GARY A. ROBINSON (#27061)
1450 Poydras Street, Suite 1510
New Orleans, Louisiana 70112
(504) 525-7500
**Attorneys for SEACOR Marine, Inc. and
SEACOR Offshore, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been forwarded to opposing counsel by placing same in the United States mail, properly addressed, with first class postage affixed thereto, this ___ day of February, 2001.

ALFRED J. RUFTY III

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **SEACOR MARINE, INC. AND** | * | **CIVIL ACTION** |
| **SEACOR OFFSHORE, INC.** | * | |
| | * | **NO.:   00-0166** |
| **Plaintiffs** | * | |
| | * | **SECTION: "S" (1)** |
| **VERSUS** | * | |
| | * | |
| **HOUMA FABRICATORS, A DIVISION** | * | |
| **OF L.O.R., INC., AIR COMPRESSOR** | * | |
| **ENERGY SYSTEMS, INC., DRESSER** | * | |
| **INDUSTRIES, INC. , AND LEROI** | * | |
| **INTERNATIONAL, INC. D/B/A** | * | |
| **COMPAIR  LEROI** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*

## SEACOR'S CONTROVERSION OF LEROI'S
## STATEMENT OF ALLEGED UNCONTESTED FACTS

Plaintiff SEACOR Marine, Inc. and SEACOR Offshore, Inc. respectfully respond

to the LeRoi's Statement of Alleged Uncontested Facts as follows:

1.    Admitted;

2.    Admitted;

1

3.    Admitted, except SEACOR takes issue with the description of the LeRoi

compressor unit as "some ... component parts."

4.    SEACOR admits that the LeRoi compressor package apparently was

shipped to ACES on or about November 18, 1996.

5.    Admitted;

6.    Admitted;

7.    Admitted;

8.    Admitted;

9.    Admitted, except SEACOR notes that its final expert reports are not due for

approximately one month at which time Mr. Casellas may supplement his

prior opinions;

10.    Admitted;

11.    Denied;

12.    Denied;

13.    Denied;

14.    Admitted;

15.    Denied as written.

Respectfully submitted:

HARRIS & RUFTY, L.L.C.

_____

RUFUS C. HARRIS III (#6638)
ALFRED J. RUFTY III (#19990)
GARY A. ROBINSON (#27061)
1450 Poydras Street, Suite 1510
New Orleans, Louisiana 70112
(504) 525-7500
**Attorneys for SEACOR Marine, Inc. and
SEACOR Offshore, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been
forwarded to opposing counsel by placing same in the United States mail, properly
addressed, with first class postage affixed thereto, this ___15___ day of February 2001.

_____
ALFRED J. RUFTY III

3

1

1

2

3                UNITED STATE DISTRICT COURT

4                EASTERN DISTRICT OF LOUISIANA

5

6

7   SEACOR MARINE, INC.,              *   CIVIL ACTION
    SEACOR OFFSHORE, INC.             *
8                                     *   NUMBER 00-0166
    VERSUS                            *
9                                     *   SECTION "S"
    HOUMA FABRICATORS, A DIVISION     *
10  OF L.O.R., INC., AIR COMPRESSOR   *   MAGISTRATE (1)
    ENERGY SYSTEMS, INC., DRESSER     *
11  INDUSTRIES, INC., and LEROI       *
    INTERNATIONAL, INC. d/b/a
12  COMPAIR LEROI

13

14

15        Deposition of O.E. "BUTCH" MONNIER, JR., taken

16   at the offices of Houma Fabricators, Peach Street,

17   Houma, Louisiana, on the 7th day of December, 2000.

18

19

20

21

22

23

24

25

**EXHIBIT**
**"A"**

1    Q.    In looking at the photographs of fire-damaged

2    equipment, have you observed any equipment on those

3    photographs that you know to have been provided by

4    Waveland or Seacor?

5    A.    Yes.

6    Q.    Please tell me what damaged equipment from

7    those fire photos you're referring to.

8    A.    Stern thruster engine.

9    Q.    Okay.  Anything else?

10    A.    Not right off the top of my head.

11    Q.    Okay.  And it's your understanding that that

12    stern thruster engine was paid for separately by

13    Waveland, slash, Seacor?

14    A.    Yes.

15    Q.    So that stern thruster engine was not part of

16    the vessel that you provided to Seacor; is that right?

17    MR. KLEINMAN:

18        Object to the form of the question.

19    A.    Objection.

20    THE REPORTER:

21        I didn't get his answer.

22    MR. JOHNSON:

23        He said "objection."

24    MR. RUFTY:

25        The witness said "objection"?

```
 1          MR. JOHNSON:

 2               That's what he said.  But I think you may

 3     want to rephrase it.

 4          MR. RUFTY:

 5               I'd be happy to rephrase it.

 6     BY MR. RUFTY:

 7     Q.    Was proving a stern --

 8          MR. McCARTHY:

 9               I joint the witness in his objection.

10     MR. RUFTY:

11     Q.    All right.  Was providing the stern thruster

12     engine part of your deal with Galaxie, slash, Seacor?

13          MR. JOHNSON:

14               I think you need to explain what "deal"

15     means.  Initially you asked him whether or not it was

16     part of the vessel, and I think clearly it was.

17          MR. RUFTY:

18               I agree with that.

19          MR. JOHNSON:

20               You're talking about whether or not

21     Seacor, slash, Waveland agreed that they were going to

22     furnish the stern thruster as opposed to it being

23     furnished by Houma Fabricators?

24          MR. RUFTY:

25               As opposed to it being a piece of
```

```
 1    equipment that Houma Fabricators was suppose to
 2    furnish under the contract.
 3            MR. JOHNSON:
 4                All right.  Do you understand the
 5    question?
 6            MR. McCARTHY:
 7                I don't.
 8            THE WITNESS:
 9                No.  But I think I could answer.
10    BY MR. RUFTY:
11    Q.    Well, I want you to understand the question.
12    I'll ask it again.
13            Was that stern thruster equipment a piece of
14    equipment that Houma was supposed to furnish with the
15    vessel under its contract with Galaxie, slash, Seacor?
16    A.    Under the contract, we allowed Seacor to
17    furnish certain pieces of major equipment of large
18    dollar cost and minimal handling so that I would not
19    mark them up 10 percent for handling and charge Seacor
20    for it.  Now does that answer your question?
21    Q.    Very well.  Thank you, sir.  And the stern
22    thruster was one of those pieces of major equipment?
23    A.    Yes.
24    Q.    Were there any other pieces of such equipment
25    that were damaged in the fire, based on your review of
```

1                UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3    _____

4    SEACOR MARINE AND SEACOR          : 

5    OFFSHORE, INC.                    :

6              Plaintiffs              :

7        -vs-                          : CASE NO.

8    HOUMA FABRICATORS, A DIVISION     : 00-0166

9    OF L.O.R., INC., AIR COMPRESSOR   :SECTION "S"

10   ENERGY SYSTEMS, DRESSER INDUSTRIES,:

11   INC., AND LEROI INTERNATIONAL,    :

12   Dba COMPAIR LEROI                 :

13              Defendants             :

14   _____

15

16              Deposition of RON W. KEEN, a witness

17   herein, taken by the Plaintiffs as upon cross

18   examination and pursuant to the Ohio Rules of

19   Civil Procedure as to the time and place and

20   stipulations hereinafter set forth, at the

21   Holiday Inn, 400 Folkerth Avenue, Sidney, Ohio,

22   at 9:31 a.m., on Wednesday, October 18, 2000,

23   before Mary A. Frazier, a RMR, CRR, and Notary

24   Public within and for the State of Ohio.

25                   * * * * * *

EXHIBIT

"B"

1    WHEREUPON:

2                      RON W. KEEN,

3    of lawful age, a witness herein, being first

4    duly sworn as hereinafter certified, was

5    examined and deposed as follows:

6                    CROSS EXAMINATION

7    BY MR. RUFTY:

8         Q.    Good morning, Mr. Keen.

9         A.    Good morning.

10        Q.    Would you please state your full

11   name for the record?

12        A.    Ronald W. Keen.

13        Q.    And what is your address, please?

14        A.    862 Juniper Court, Tipp City, Ohio,

15   45371.

16        Q.    How long have you been employed at

17   LeROI?

18        A.    Since September 3rd, I believe, of

19   1997.

20        Q.    '97, you say?

21        A.    Yes.

22        Q.    I take it you still are employed at

23   LeROI?

24        A.    Yes, I am.

25        Q.    In what capacity, please?

5

1          A.    Director, engineering.

2          Q.    What are the job responsibilities of

3     the director of engineering?

4          A.    Director of engineering, briefly,

5     facilitates new designs and improvements to

6     products by supervising senior engineers and

7     technicians.

8          Q.    Are you the top dog in the

9     engineering department?

10          A.    I am the engineering director.

11          Q.    So you don't have a boss in the

12     engineering department; is that correct?

13          A.    I report to a VP of engineering in

14     England.

15          Q.    In England.  And for what company

16     does that --

17          A.    CompAir.

18          Q.    What is his name, please?

19          A.    Harry Craig.

20          Q.    Where is CompAir based?

21          A.    In --

22               MR. WALLACE:  Excuse me, where

23     is CompAir, were you asking the principle place

24     of business or where do --

25               MR. RUFTY:  Where is its

1    are the material, the spec is the SAE J1402.

2    BY MR. RUFTY:

3        Q.    Who promulgates that specification,

4    if you know?

5        A.    I don't know, other than --

6            MR. WALLACE:    I am sorry,

7    counsel, which specification, SAE?

8            MR. RUFTY:    SAE J1402.

9            THE WITNESS:    Other than at the

10    time, I don't know who this was, but basically

11    this spec correlates to a 300 degree F or 250

12    degree F in air as far as maximum temperature.

13    BY MR. RUFTY:

14        Q.    F refers to Fahrenheit?

15        A.    Yes.

16        Q.    And this spec refers to the spec SAE

17    J1402, is that correct?

18        A.    That's correct.

19            MR. WALLACE:    Off the record.

20            (WHEREUPON, a discussion was

21    held)

22    BY MR. RUFTY:

23        Q.    The hose C5C that you referred to

24    was manufactured by Gates?

25        A.    Yes.    When you compare the Gates to

1    the SAE 100R5, which is a 212 degree F max

2    temperature or 160 degrees in air.

3         Q.    Did you have an understanding as to

4    what temperature range is expected in the

5    typical use of the LeROI compressors?

6         A.    Yes, the compressors shut down at

7    235 degrees F.  That's why the need for the 300

8    degree F spec.

9              So upon, based on that, and

10   seeing the difference in the spec, and it may

11   have been the same time, I can't remember which

12   was first or which was second, but contacted

13   Aeroquip and we started just to verifying the

14   specs of the FC350.

15             And I don't recall exactly how

16   it was actually started, but then the issue of

17   compatibility came up, all right, and

18   typically, and again, I don't know what

19   happened back before I came there.

20             But typically like what we would

21   do now is, I'll demonstrate by example, we

22   bring -- recently, within the last year, we

23   imported a new machine from our sister company

24   in the U.K., and one of the things that we did

25   before we could start using our oil was that we

1    and verified that by the Aeroquip FC350 spec,

2    that they were those hoses or that they were

3    acceptable spec.  And again, the catalog will

4    state compatibility with it.  We took the extra

5    measure in this case to actually have Aeroquip

6    to physically rerun a compatibility check on

7    our particular one.

8        Q.   Do you recall if the Gates catalog

9    or other information provided by Gates

10    contained information concerning compatibility?

11        A.   I don't recall.  But the problem

12    with the Gates was it didn't meet the spec.  It

13    wasn't the right hose for the spec.

14              MR. WALLACE:  Let the record

15    reflect the witness was pointing to the

16    temperature.

17              THE WITNESS:  Not the right

18    temperature, and it doesn't meet the J, excuse

19    me, SAE J1402 spec.

20              MR. McCARTHY:  That's the oil

21    compatibility?

22              THE WITNESS:  The oil

23    compatibility is included in the SAE spec,

24    that's correct.

25              MR. McCARTHY:  Okay, thank you.

1              THE WITNESS:  As opposed to the

2    SAE 100R5 spec, as I understand.

3    BY MR. RUFTY:

4         Q.    And was it a compatibility problem

5    that was the reason that that hose did not meet

6    the SAE J1402 spec?

7              MR. WALLACE:  Object to the

8    form, asked and answered, but go ahead.

9              THE WITNESS:  That's partial.

10   The main driver in the beginning was the

11   temperature rating.  That was the main concern,

12   the flag that went up.

13   BY MR. RUFTY:

14        Q.    How did you learn initially about a

15   potential compatibility problem?

16              MR. WALLACE:  Asked and

17   answered.

18              MR. RUFTY:  It hasn't been.

19              MR. WALLACE:  He said he didn't

20   recall.

21              THE WITNESS:  I don't recall.

22   BY MR. RUFTY:

23        Q.    Oh, okay, fair enough.  I apologize

24   if I already asked that.

25              You also mentioned a pressure

1          A.    I don't know that it was.  I would

2    assume so, but I don't know.

3          Q.    All right.  And the note --

4          A.    Let me say that as I understand from

5    our purchasing, it is standard practice for

6    them to supply drawings, but I mean that's --

7          Q.    That's standard procedure?

8          A.    That's standard.

9          Q.    The note at the bottom says,

10   reference Aeroquip FC350, Stratoflex 213.

11              MR. WALLACE:  Or equal.

12   BY MR. KLEINMAN:

13         Q.    Or equal.  What is a temperature

14   range for the Stratoflex 213, if you know?

15         A.    300 degrees F.

16         Q.    And what is the temperature range

17   for the Gates C5C?

18         A.    212, I believe.  Unless you are in

19   air, then they are 160 and something, I forget

20   what they are.  Can I read?

21         Q.    Sure, go ahead.

22         A.    Temperature range on the -- I don't

23   have the Stratoflex.  Let me give it to you.

24   Stratoflex is 300 degrees with petroleum-based

25   oils, 250 degrees with diester-based

1    anything to you about failures of hoses in the

2    field.  Due to incompatibility problems.

3    BY MR. KLEINMAN:

4        Q.    Right.

5        A.    No.

6        Q.    None that you were aware of?

7        A.    No.  And actually, I get to go

8    farther, is that I don't ever recall

9    compatibility being an issue until -- because

10   as I state, again, my first look at the thing

11   was a comparison of the specs, seeing the

12   temperature concern.

13                And then, like I say, I still

14   don't, you know -- but compatibility at the

15   same time was an issue.  So before that, no.

16       Q.    Did you determine that Hart had

17   supplied Gates C5C hoses to CompAir LeROI as

18   part of their investigation?

19       A.    I did not investigate that.

20       Q.    So you don't know for how much of a

21   length of time in the past Hart had supplied

22   C5C hoses to CompAir LeROI?

23       A.    I don't remember that myself, no.

24       Q.    What kind of engineer's degree do

25   you have, sir?

1          A.    Engineering mechanics and materials.

2          Q.    Take a look at this exemplar hose,

3    which is the one with the painted couplings.

4              MR. WALLACE:  I am sorry,

5    counsel, I don't believe that's an exemplar.

6    That's a real piece of evidence.

7              MR. KLEINMAN:  You are correct,

8    this is the one that was taken off the vessel

9    and was represented to us to have been taken

10   off by ACE.

11             MR. WALLACE:  Right, correct.

12             MR. KLEINMAN:  As part of the

13   recall campaign.

14             MR. WALLACE:  Right.

15   BY MR. KLEINMAN:

16         Q.    Take a look at this.  Do the

17   couplings on this hose match the sketch that is

18   marked as Exhibit 2A?

19             MR. WALLACE:  Objection to

20   form.  Go ahead.

21             MR. RUFTY:  I join in the

22   objection.

23             MR. WALLACE:  He is just lawyer

24   talking.

25             THE WITNESS:  I'm not -- I don't

1              MR. WALLACE:  We have got time

2    problems, and what I was basically trying to

3    say was these questions had already been asked

4    and answered and they also go beyond the area

5    of inquiry.

6              MS. LAPORTE:  Okay, I am not

7    going to pursue it then.

8              RECROSS EXAMINATION

9    BY MR. RUFTY:

10        Q.   A very quick couple of follow-ups.

11   Is the Gates C5C hose one that fits the

12   description of the LeROI product number 73-951

13   series?

14        A.   No.

15             MR. WALLACE:  Same objection.

16             THE WITNESS:  That doesn't meet

17   the spec.  By reading their literature and by

18   their own admission, it doesn't meet the spec.

19   BY MR. RUFTY:

20        Q.   Okay.  I understand it doesn't meet

21   the spec.  Make sure we are on the same page.

22   The product number, 73-951 series, to my

23   understanding, refers to various, to hoses of a

24   various size and type.

25        A.   Only length.

1        Q.    Only length.

2        A.    One particular size, only different

3    lengths.

4        Q.    Okay.  The designation by LeROI,

5    though, of 73-951 does not refer to a

6    particular manufacturer?

7        A.    No, it refers to the SAE spec.

8        Q.    Okay.

9              MR. WALLACE:  Excuse me,

10    counsel.  It refers to two particular

11    manufacturers or equal.

12             MR. RUFTY:  Yes, okay.

13             MR. WALLACE:  And the question

14    is whether this is an or equal.

15    BY MR. RUFTY:

16        Q.    To your knowledge, was the Gates C5C

17    hose used in applications calling for a 73-951

18    series hose?

19             MR. WALLACE:  Object to the

20    form.  Beyond the area of inquiry.

21             THE WITNESS:  Yeah.  Yes, it

22    was.

23    BY MR. RUFTY:

24        Q.    I thought so.  I just wanted to make

25    sure that's what I was understanding.

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF LOUISIANA

3    _____

4    SEACOR MARINE AND SEACOR              :

5    OFFSHORE, INC.                        :

6              Plaintiffs                  :

7         -vs-                             : CASE NO.

8    HOUMA FABRICATORS, A DIVISION         : 00-0166

9    OF L.O.R., INC., AIR COMPRESSOR       :SECTION "S"

10   ENERGY SYSTEMS, DRESSER INDUSTRIES,:

11   INC., AND LEROI INTERNATIONAL,        :

12   Dba COMPAIR LEROI                     :

13              Defendants                 :

14   _____

15

16              Deposition of ROGER HART, a witness

17   herein, taken by the Plaintiffs as upon cross

18   examination and pursuant to the Ohio Rules of

19   Civil Procedure as to the time and place and

20   stipulations hereinafter set forth, at the

21   Holiday Inn, 400 Folkerth Avenue, Sidney, Ohio,

22   at 1:15 p.m., on Wednesday, October 18, 2000,

23   before Mary A. Frazier, a RMR, CRR, and Notary

24   Public within and for the State of Ohio.

25              *  *  *  *  *  *

EXHIBIT

"C"

1    made?

2         A.   No, I do not.

3         Q.   Please look at the post script to

4    this exhibit, 7A.  Let me know when you have

5    had an opportunity to read it.

6         A.   Yes.

7         Q.   Does that postscript suggest to you

8    that LeROI had been communicating with Hart

9    concerning potential hose failures, at least as

10   early as July 1998?

11            MR. WALLACE:  Objection to form,

12   calls for a conclusion, lack of foundation.

13   BY MR. RUFTY:

14        Q.   You can answer subject to that.

15        A.   From what I can see here, we were

16   trying to get some kind of a response from

17   LeROI with respect to the analysis that had

18   been performed by Gates warning them that there

19   might be a problem if they were to be using the

20   phosphate esters, which at this point we still

21   were never told that they were using those

22   fluids in our hoses.

23        Q.   Is it your understanding that in

24   this 7-98 meeting referred to in Exhibit 7A,

25   that your company made known to LeROI that

1    there might be a problem in using oils with

2    phosphate esters?

3              MR. WALLACE:  Object to the

4    form, calls for a conclusion, lack of

5    foundation.

6              THE WITNESS:  I think that what

7    was written in this letter basically covers

8    what we were trying to tell them.

9    BY MR. RUFTY:

10         Q.   And what exactly was that, please?

11         A.   That we were still awaiting their

12   response to the analysis that Gates had made on

13   the hose.

14         Q.   And that analysis was that there was

15   a problem with using C5C hoses with oils

16   containing phosphate esters?

17         A.   Yes.

18              MR. WALLACE:  Object to the

19   form.

20   BY MR. RUFTY:

21         Q.   And that information was apparently

22   presented to LeROI at least as early as this

23   July '98 meeting; is that your understanding?

24         A.   Correct.

25              MR. WALLACE:  Object to the