

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
FEB 22 2001
2001 FEB 22 AM 11: 21

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SEACOR MARINE, INC. AND | * | CIVIL ACTION |
| SEACOR OFFSHORE, INC. | * | |
| | * | NO. 00-0166 |
| VERSUS | * | |
| | * | SECTION "S" |
| HOUMA FABRICATORS, A DIVISION | * | |
| OF L.O.R., INC., AIR COMPRESSOR | * | MAGISTRATE (1) |
| ENERGY SYSTEMS, INC., DRESSER | * | |
| INDUSTRIES, INC., and LEROI | | |
| INTERNATIONAL, INC. d/b/a/ | | |
| COMPAIR LEROI | | |

## REPLY MEMORANDUM IN
## SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

Plaintiffs, Seacor Marine, Inc., and Seacor Offshore, Inc. ("Seacor") contend that a hose

attached to a LeRoi compressor in the M/V GALAXIE engine room caused the fire that is the

subject of this lawsuit. Defendants, LeRoi International, Inc. d/b/a CompAir LeRoi, and Dresser

Industries, Inc. ("LeRoi"), filed *Celotex* motions to "test" Seacor's proof against LeRoi and, as

expected, Seacor's opposition memorandum and response to LeRoi's statement of uncontested

___Fee_____
___Process____
_X_Dktd_____
___CtRmDep____
Doc.No._____

material facts amply demonstrate that LeRoi is entitled to summary judgment in its favor, dismissing all of Seacor's claims against LeRoi.[1]

## I. THE ECONOMIC LOSS DOCTRINE MANDATES DISMISSAL OF SEACOR'S CLAIMS

Seacor relies heavily on the Supreme Court's decision in *Saratoga Fishing Company v. J.M. Martignac & Co.*[2] and the Fifth Circuit's holding in *Nicor Supply Ships Associates v. General Motors* [3] for support in establishing that the damage to the M/V GALAXIE's stern thruster engine was not to the "product itself." However, proper readings of *Saratoga Fishing* and *Nicor* actually support LeRoi's argument that Seacor's claims are barred by the *East River*[4] economic loss doctrine.

In *Saratoga Fishing*, the M/V SARATOGA sank due to a hydraulic system fire on board the vessel. As a result, the vessel's owner lost the entire vessel, including equipment that the previous owner, his seller, had installed on the vessel to enable the vessel to fish for tuna. The owner sued the vessel's manufacturer and the hydraulic system's designer in federal court under

---

[1] Beyond their inability to prove the essential elements of their product liability claims, Seacor should also have to explain why they have ignored an alternative explanation for the cause of the fire, i.e. an arson fire set in the area of the stern thruster engine. In this regard, LeRoi refers the Court to the uncontested testimony of the vessel's captain, James Key, that an arson investigator came onboard the vessel to investigate the fire. (*See* excerpts from Captain James Key's deposition, pp. 52-53, attached hereto as Exhibit 1.) Further, assistant engineer, James Benyard, testified that the chief engineer, Allen Townsend, relegated Benyard to menial tasks such as "cleaning and painting" engine parts because he felt threatened by Benyard's intent to upgrade his license to that of a chief engineer. (*See* excerpts from Assistant Engineer James Benyard's deposition, pp. 16-19, pp. 90-96, attached hereto as Exhibit 2) Key's and Benyard's testimony also establishes that, shortly before the fire, Townsend asked that Benyard be removed from the vessel. (*See* excerpts from Assistant Engineer James Benyard's deposition, pp. 16-19, pp. 90-96, attached hereto as Exhibit 2); *see also,* excerpts from Captain James Key's deposition, pp. 17-18, attached hereto as Exhibit 1.) LeRoi submits that this is more than mere coincidence yet, rather than investigate the obvious disgruntled employee/arson possibility, Seacor insists on trying to blame anyone and everyone else. The lack of credibility of Seacor's liability theories is further illustrated by the fact that their own fire expert, George Casellas, asserts that there was a "secondary fuel fed fire" in the stern thruster engine area at the same time as the "compressor fire." (*See* Casellas Report, attached hereto as Exhibit 3, at p.3.) However, there is no evidentiary method available to test Casellas' theory that the "compressor fire" started before the "secondary fuel fed fire" because Casellas conveniently did not preserve any failed parts of the stern thruster. Instead, he only retained some of the affected compressor parts.

[2] 117 S. Ct. 1783.

[3] 876 F.2d 501 (5th Cir. 1989).

[4] *East River S.S. Corp v Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S. Ct. 2295.

strict products liability, alleging that the manufacturer defectively designed the hydraulic system.[5]

After trial, the district court concluded that the manufacturer and designer defectively designed the hydraulic system and allowed the owner to recover under strict products liability for the tuna-fishing equipment added by the previous owner. The Ninth Circuit, applying products liability law as recognized in maritime law by *East River*[6], reversed, holding that the equipment added by the previous owner was part of the "product itself," and was therefore economic loss, not recoverable under products liability.[7] The United States Supreme Court, granted certiorari to "resolve the uncertainty about *East River*" and reversed.[8] The Court held that, the "product itself" is the item that the initial user bought and everything else that is added or connected to this item is "other property."[9]

Similarly, in *Nicor*, the Court, citing *Shipco 2295, Inc. v. Avondale Shipyards, Inc.,*[10] expressly recognized that "the finished vessel" delivered by the manufacturer to the purchaser "is the product"—"the object of the contract"[11]—and that parts of the vessel damaged by its malfunctioning propeller and steering mechanisms were not, therefore, "other property."[12] "[A] defect in one component of the item sold that causes damage to unrelated components of that item [does not] constitute damage to 'other property'"[13]

Here, there is no question that the initial user and initial purchaser of the vessel are one and the same, Seacor. Also, the vessel, as originally delivered and contracted for, included the

---

[5] *Saratoga Fishing Co. v. Marco Seattle, Inc.*, 69 F.3d 1432, 1444 (9th Cir. 1995)
[6] 476 U.S. 858, 106 S.Ct. 2295 (1986).
[7] *Id.*
[8] *Saratoga Fishing Co. v. J. M. Martinac & Co.*, 117 S.Ct. 1783, 1785 (1997).
[9] *Id.* at 1788-89.
[10] 825 F. 2d 925 (5th Cir. 1987), *cert. Denied*, 108 S. Ct. 1472, 99 L. Ed. 2d 701 (1988).
[11] *Nicor*, 876 F.2d at 505 *citing Shipco*, 825 F.2d at 928-929.
[12] *Id.*
[13] *Id.*

497486_1

3

stern thruster engine.  Seacor's contention that it purchased and added the stern thruster is ludicrous.  In fact, Houma Fabricators installed the stern thruster as part of the original contract, and the stern thruster is a covered item under the warranty provisions of that contract. Accordingly, *Saratoga Fishing, Shipco, and Nicor* mandate that the **entire vessel**, including the stern thruster, must be considered the "product itself."  Thus, for the reasons set forth in LeRoi's motion to dismiss based on the *East River* economic loss doctrine, there is no admiralty jurisdiction supporting Seacor's claims against any of the defendants, and the entire suit should be dismissed.

## II.     THE ADMISSION BY SEACOR ABOUT SSL-50

Seacor admitted that the only oil used in the LeRoi compressor was SSL 50.[14] Accordingly, to satisfy its burden of proof against LeRoi, Seacor must demonstrate, by competent evidence, that the SSL 50 oil specified by LeRoi for use in the compressor, and admittedly used by Seacor was in compatible with the rubber hose later attached to the compressor and that this, in turn, caused the fire.

Seacor has not come forward with any evidence that SSL 50 was incompatible with the rubber hose on the GALAXIE compressor.  In fact, as detailed in LeRoi's original memorandum in support, the documentary evidence establishes that SSL 50 had an excellent compatibility rating for use with the type of hose at issue.

Nevertheless, Seacor's attorney has stubbornly denied LeRoi's statement of uncontested material fact that SSL 50 is compatible with rubber hoses.[15]  However, a mere assertion by counsel that a statement is "denied" cannot carry the day for Seacor.  Seacor cannot point to any evidence to support its attorney's bald denial, and this is simply not sufficient to create an issue

---

[14] *See* Seacor's Controversion to LeRoi's Statement of Uncontested Material Facts, No. 10.

[15] *See* Seacor's Controversion to LeRoi's Statement of Uncontested Material Facts, Nos. 11 – 13.

of fact. Accordingly, counsel's denial is of no consequence to these proceedings, and the Court should strike it as wholly inadmissible evidence.

By contrast, LeRoi has carried its burden of proof in this *Celotex* motion by affirmatively demonstrating that the SSL 50 oil was not "defective,"[16] or incompatible. Because Seacor has not come forward with any competent evidence to contradict LeRoi's position, there is no genuine issue of material fact to be tried. Therefore, LeRoi is entitled to judgment, as a matter of law. Nothing that LeRoi allegedly did or did not do caused any harm to Seacor.

## III.     THE ALLEGED "TEMPERATURE DEFICIENCY"

For the first time in this case, Seacor argued in its opposition memorandum that there was a "hose temperature deficiency" because the rubber hose on the GALAXIE "...lacked the necessary temperature rating to meet the industry specification for this application," and LeRoi failed to warn Seacor.[17]

The uncontroverted evidence before the Court is:

1).     The Gates C5C rubber hose had a temperature rating of up to 212° F;[18]

2).     The operating temperatures of the LeRoi compressor were below 212° F;[19] and

3).     Seacor has offered no fact or opinion evidence to in any way prove that there was any problem with the LeRoi compressor, or its operating temperatures, much less that any characteristic of the LeRoi compressor was unreasonably dangerous as plaintiffs are required to prove to prevail on their product liability claim.

---

[16]Seacor is mistaken in its position that LeRoi has to produce any evidence particularly "verified" proper summary judgment evidence. See legal authorities cited on page 3 of LeRoi's motion for partial summary judgment on causation.

[17] It must be remembered that all of the documentary evidence shows that LeRoi delivered this compressor "hard-piped" and that LeRoi had no knowledge that someone replaced the hard piping with a rubber hose.
Notwithstanding all of that, though, even assuming that the hose was on the compressor parts as delivered and that LeRoi knew about the alleged "deficiency" in the hose, what does this "deficiency" have to do with the fire?  The obvious answer is "Nothing!"

[18] See LeRoi's Statement of Uncontested Material Facts, No. 12.

Even if we assume arguendo that a Gates C5C rubber hose should have had higher temperature ratings, what difference does it make when the evidence is that the temperatures in the compressor never exceeded 212° F? What difference does LeRoi's alleged failure to comply with an "industry specification" make, if the plaintiffs fail to show how such failure to comply in any way caused the fire?

Seacor had a "cause and origin" expert, George Casellas, and a metallurgist, Dr. Courtney Busch, on this case within days of the fire and they remain on the case today. Further, the testimony about the alleged "temperature deficiency" occurred October 2000, two months before the plaintiffs' experts reports were due yet these original and supplemental reports are absolutely silent about any "temperature deficiency."[20] Apparently, then, Seacor's experts have enough integrity that they will not give Seacor's counsel an affidavit to support his baseless argument that the alleged failure to comply with an industry specification for a maximum temperature to which the hose was never exposed in any way caused the fire that is the subject of this lawsuit.

Additionally, since October 2000, the parties have set aside large blocks of time to take corporate depositions and fact witness depositions. Despite this, though, Seacor has not scheduled one deposition to explore the alleged "temperature deficiency" issue. In fact, earlier this month, Seacor's attorney canceled the scheduled deposition of a Gates corporate representative! Accordingly, Seacor's claim that it should be allowed further discovery on this "issue" should fall on deaf ears. The fact is that Seacor has had more than sufficient time to explore this "theory" and it has chosen not to do so because there is simply nothing to it.

---

[19] *Id.*

[20] See plaintiffs' expert reports, attached hereto as Exhibits 3 and 4.

497486_1

6

Stripped to its bare essentials, then, the "temperature deficiency" argument is a red herring based on the argument of counsel, not admissible evidence. Even if we assume *arguendo* that there was a "temperature deficiency of the hose to meet an industry standard," there is absolutely no fact or opinion evidence to establish that such a "deficiency" was an unreasonably dangerous condition that caused or contributed to the fire. Since the "temperature deficiency" issue has no potential to alter the outcome of the case, it is not a material issue of fact for summary judgment purposes and Seacor has again failed to show that anything LeRoi allegedly did or failed to do caused them harm.

## IV.     THE OTHER "THEORIES OF LIABILITY"

It is also telling that, in response to LeRoi's motion for partial summary judgment, Seacor has failed to present evidence or legal argument on its remaining "theories of liability." Apparently, then, Seacor concedes that it has no admissible evidence, or legal authorities to support its claim for punitive damages against LeRoi,[21] that it has no redhibition claim against LeRoi,[22] and that Seacor has no legal basis for warranty or breach of contract claims against LeRoi.[23]

## V.     CONCLUSION

There is no genuine disputed issue of material fact for the trier of fact to decide at trial:

1).     Seacor's claims against all of the defendants are barred by the *East River* economic loss doctrine;

2).     There is no evidence there was anything wrong with the SSL 50 oil that Seacor admits it used; and

---

[21] *See* LeRoi's motion on plaintiffs' new legal theories, pp. 7–10.
[22] *Id* at pp. 10–11.
[23] *Id.* at pp. 11–12.

497486_1

7

3.)     There is no evidence there was anything wrong with the LeRoi compressor that could have caused the fire, much less constituted an unreasonably dangerous characteristic of the product.

On the contrary, there is substantial reason to believe that this fire was deliberately set by a member of the crew because of a decision to reassign him. Unfortunately for Seacor, though, the defendants are not liable for any alleged arson committed by a crewmember on the M/V GALAXIE, and this issue is not material to plaintiffs' claims against LeRoi and the other defendants. Accordingly, LeRoi is entitled to summary judgment as a matter of law dismissing all of plaintiffs' claims against it.

Respectfully submitted,

Campbell E. Wallace, T.A., #13195
Ivan M. Rodriguez, #22574
**CHAFFE, McCALL, PHILLIPS**
**TOLER & SARPY, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone: (504) 585-7000
***Attorneys for LeRoi International, Inc. d/b/a***
***CompAir LeRoi***

### Certificate of Service

I hereby certify that I have on this 20th day of February, 2001, served a copy of the foregoing pleading on counsel for all parties to this proceeding, by hand delivery, facsimile, or by depositing the same in the United States mail, properly addressed, and first-class postage prepaid.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SEACOR MARINE AND
SEACOR OFFSHORE, INC.                    NO. 00-0166

VERSUS                                   MAGISTRATE (1)

HOLMA FABRICATIONS, A                    SECTION "S"
DIVISION OF L.O.R., INC.
AIR COMPRESSOR ENERGY SYSTEMS,
INC., and LEROI INTERNATIONAL
d/b/a COMPAIR LEROI

Deposition of CAPTAIN JAMES P. KEY,
given in the above-entitled cause, pursuant to the
following stipulation, before Paul Stahls, Certified Court
Reporter, authorized under the laws of the State of
Louisiana to administer oaths to witnesses, taken in the
offices of Harris & Rufty, 1450 Poydras Street, Suite 1510,
New Orleans, Louisiana, on the 12th day of January, 2001.

---

I N D E X

Caption                                                  1

Appearances                                              3

Agreement of Counsel                                     5

Examination by:

    MR. WALLACE                                          5
    MR. KLEINMAN                                        79
    MR. WALLACE                                         82
    MR. McCARTHY                                        85
    MR. WALLACE                                        103
    MR. McCARTHY                                       108

Witness's Certificate                                  110

Reporter's Certificate                                 111


Exhibit No. K-1 (Motor mount sketch)                    24
        No. K-2 (Engine room logs)                      28
        No. K-3 (Hose and clamp sketch)                 33
        No. K-4 (Logbook)                               52
        No. K-5 (Trim sketch)                           24
        No. K-6 (Accident/injury/Death Report)          59

---

3

A P P E A R A N C E S:

HARRIS & RUFTY
Attorneys at Law
BY:  ALFRED RUFTY III, ESQ.
1450 Poydras Street
Suite 1510
New Orleans, Louisiana  70112

    Representing the Plaintiffs,
    Seacor Marine, Inc. and
    Seacor Offshore, Inc.


CHAFFE, McCALL, PHILLIPS, TOLER & SARPY
Attorneys at Law
BY:  CAMPBELL E. WALLACE, ESQ.
1100 Poydras Street
23rd Floor
New Orleans, Louisiana  70163

    Representing the Defendants,
    LeRoi International d/b/a CompAir
    LeRoi and Dresser Industries


YOUNG, RICHAUD, THEARD & MYERS
Attorneys at Law
BY:  ROBERT YOUNG, JR., ESQ.
1515 Energy Center
1100 Poydras Street
New Orleans, Louisiana  70163

    Representing the Defendant,
    Air Compressor Energy Systems, Inc.

---

4

APPEARANCES (Continued):

HULSE & WANEK
Attorneys at Law
BY:  RANDALL L. KLEINMAN, ESQ.
1010 Common Street
Suite 2800
New Orleans, Louisiana  70112

    Representing the Defendant,
    Hart Industries


WARD, NELSON & PELLETERI
Attorneys at Law
BY:  SUSAN LaPORTE, ESQ.
1539 Jackson Avenue
6th Floor
New Orleans, Louisiana  70130

    Representing the Defendant,
    Gates Company


Reported by:  PAUL STAHLS
              Certified Court Reporter

EXHIBIT
1
tabbies

17

1           yourself, Don Walden and James Vickers?

2  A.  Mike Soileau.

3  Q.  Is he still with Seacor?

4  A.  Yes, he is.  He's aboard the GALAXY right now with

5        Don.  He works with Don Walden.

6  Q.  What were your responsibilities as captain of the

7        GALAXY?

8  A.  Total operation of the vessel, report to the

9        customer, report to Seacor management.

10  Q.  Who is the Dowell-Schlumberger companyman who was on

11        board the vessel at the time of the fire?

12  A.  Roy Labat.

13  Q.  Is he still with Dowell?

14  A.  Yes, he is.

15  Q.  Does he still work on the GALAXY?

16  A.  Yes, he does.

17  Q.  Do you know where he lives?

18  A.  No, I don't.  But I believe he is aboard the GALAXY

19        at this time.

20  Q.  Did you ever have any problems with working with Mr.

21        Townsend?

22  A.  No.

23  Q.  Do you know if Mr. Townsend ever had any problems

24        working with Mr. Benyard?

25  A.  There was animosity between the two of them.  I

18

1        believe at the time of the fire that Mr.

2        Benyard -- that was his last hitch to be aboard

3        the M/V GALAXY.  I believe that Mr. Townsend

4        had requested that Seacor remove him from the

5        vessel.

6  Q.  Do you know why?

7  A.  I can't remember.

8  Q.  You said there was animosity between the two.  Do you

9        know the general nature of it?

10  A.  Basically, Mr. Benyard wasn't doing his job, at least

11        that's what Allen Townsend was telling me.

12  Q.  Was there any write-ups in the personnel file or

13        anything like that where Mr. Townsend would

14        write to the folks down in Morgan City and say

15        --

16  A.  Not that I know of.

17  Q.  Did you ever see any arguments between Mr. Benyard

18        and Mr. Townsend?

19  A.  No, I didn't.

20  Q.  Did you ever have any problems with the dynamic

21        positioning system, particularly the stern

22        thruster, which caused the GALAXY to go back to

23        Houma Fabricators for some work?

24  A.  Yes, I remember that.  The shaft was out of alignment

25        and that was corrected, brought back to true,

19

1        by Houma Fabricators.

2  Q.  Were you captain on board the GALAXY when the shaft

3        got out of alignment?

4  A.  No, I was not.

5  Q.  Do you know who the captain was?

6  A.  Don Walden.

7  Q.  Did Don Walden tell you that he had been seeking

8        shelter for the vessel from weather and had

9        used the dynamic positioning system to keep the

10        vessel alongside of a bank?

11  A.  No, he did not.

12  Q.  Did anybody ever tell you that?

13  A.  No.

14  Q.  Did Don Walden ever tell you what had happened to

15        cause the shaft to get out of alignment on the

16        stern thruster?

17  A.  No, he did not.

18  Q.  How do you know if the shaft gets out of alignment on

19        the stern thruster?

20  A.  We had severe vibration in the stern thruster.  It

21        snapped the motor mounts.  Excuse me, not motor

22        mounts.  It snapped one motor mount, and the

23        rest of them were all loose, so Chief Townsend

24        tightened them back.  We did not use that

25        system again until it was corrected.

20

1  Q.  Did you see that vibration?

2  A.  Yes.

3  Q.  You went down into the engine room and you and Chief

4        Townsend said, "Look, there's a severe

5        vibration down here and" --

6  A.  You could see it.

7  Q.  About when did this occur in relationship to the

8        fire, this severe vibration that caused it to

9        go back to Houma Fabricators?  Was it months or

10        --

11  A.  It was months before the fire.  And the corrections

12        were made way before the fire.

13  Q.  That's what I was asking.

14  A.  The corrections to the system were made way before

15        the fire.

16  Q.  And who did the corrections?

17  A.  Houma Fabricators.

18  Q.  You say that on the -- I'm a little confused.  Was it

19        Don Walden or you who was aboard the vessel at

20        the time the severe vibrations started?

21  A.  Don Walden.

22  Q.  And then you had the next --

23  A.  Hitch.

24  Q.  -- hitch?  What did he tell you when you came aboard

25        to take over?

49

1  the location?
2  A. Yes. We offloaded an iron rack, which is straight
3     joints of pipe, approximately four foot in
4     length. I don't know how many they have on it.
5     What they call a chickson (phonetic) rack,
6     which is swivel connectors that allows them to
7     join the straight joints of pipe together, and
8     the co-flex hose. I'm not sure what else they
9     took up on the job at that time.
10 Q. Do you know the approximate tonnage of that
11    equipment?
12 A. Not offhand, no.
13 Q. Can you give me --
14 A. I can't even guesstimate.
15 Q. Where was that equipment stored during the voyage
16    from port out to the jobsite?
17 A. On the stern of the vessel, on deck.
18 Q. And how was it offloaded onto the rig or worksite?
19 A. By crane.
20 Q. From the rig?
21 A. Yes.
22 Q. Was there any reason you know to run the compressor
23    other than blowing the propant?
24 A. Yes. The chief supplies Schlumberger with air for
25    their acid tank for them to move acid to a

50

1  blender which is on deck.
2  Q. Do you know if the compressor was used at all the day
3     of the fire other than to blow propant?
4  A. I have no idea.
5  Q. Am I correct that the entire time that the vessel is
6     in DP mode, the stern thruster and the bow
7     thruster and the main prime movers would be
8     operating?
9  A. Yes.
10 Q. How long had you all been in a position where you
11    could have pumped propant?
12 MR. RUFTY:
13       Object to the form. It calls for
14    speculation.
15 A. From 0900 that morning we were on position.
16 Q. And you could have pumped propant that entire day,
17    pumped it until the time of the fire?
18 A. Actually, we didn't know how much to transfer up
19    until the Schlumberger supervisor talked to us.
20 Q. But you were in a position where you could have done
21    it?
22 A. Yes.
23 Q. Presumably, we'd have to check his log to figure out
24    what he was doing?
25 A. Right.

51

1  Q. After the fire, did you go down and look at the hose
2     that allegedly failed that was connected to the
3     compressor?
4  A. I did, but not until the vessel was behind Seacor's
5     office.
6  Q. About what day was that? After you finished the
7     towing?
8  A. A day or two after that, maybe.
9  Q. Between the time of the fire on the late evening of
10    the 30th of January and that time when you went
11    back and looked at it behind the Seacor office,
12    what if any precautions had been taken to keep
13    people out of the engine room?
14 A. The engine room access doors on the main deck were
15    locked, padlocked.
16 Q. Who padlocked them and when?
17 A. The chief engineer, and I'm not sure when. I'm not
18    sure when they got locked, but I know he locked
19    them.
20 Q. Was it at some point after the fire and before the
21    vessel arrived in port that he padlocked it, or
22    did he padlock it when he got to port?
23 A. I'm not sure.
24 Q. When the vessel first arrived to port, who if anyone
25    came aboard and went into the engine room from

52

1  Seacor?
2  A. I don't know offhand. I don't know.
3  Q. Between the time the vessel arrived in port and when
4     you went down into the engine room a couple of
5     days after it got into port, had anyone, to
6     your knowledge, gone into the engine room?
7  A. Surveyors and a fire inspector and an arson
8     inspector.
9  Q. When you say "a fire inspector," is that someone from
10    Morgan City?
11 A. Somebody that they had called out to come and do an
12    investigation. I don't know who he is. It
13    wasn't anybody from Seacor.
14 Q. It wasn't a surveyor?
15 A. They had a surveyor that came on board in that time
16    frame, but I don't know who he was. That may
17    have been Seacor's people.
18 Q. When you say "a fire inspector," is that like a
19    government official?
20 A. No. I think that was somebody local that does fire
21    inspections. I don't know who he is.
22 Q. Do you remember what he looked like?
23 A. No. They just told me that he would be coming on
24    board to look around.
25 Q. And you said there was an arson inspector?

53

1  A.  Right.
2  Q.  Who was he?
3  A.  I don't know his name either.
4  Q.  But he was different from the fire inspector?
5  A.  Different man, yes.
6  Q.  Do you know if the arson inspector was from the
7      government or insurance company or what?
8  A.  I don't know who he was with. I think he's maybe an
9      independent. I don't know for sure.
10 Q.  What did these folks do? Did you go down into the
11     engine room with them?
12 A.  No, sir, I did not. I did not want to go down there.
13 Q.  Did you go into the engine room while the fire
14     inspector and arson inspector were there?
15 A.  No, sir, I did not.
16 Q.  Did you go into the engine room and look at the hose
17     involved with the compressor at any point in
18     time after the fire?
19 A.  After the inspector -- after all the inspectors had
20     been down there, I went down there.
21 Q.  What did you see?
22 A.  Burnt debris everywhere.
23 Q.  Did you see the hose that was supposedly a problem
24     with the compressor?
25 A.  Yeah, I did.

54

1  Q.  Was the hose in place?
2  A.  No, it was -- one end was attached; the other end was
3      not. The metal casing that surrounds the hose
4      was in place, but all the rubber that's inside
5      of the metal casing was gone. It was just a
6      shell. The fitting that should have been on
7      the end of it was attached onto the piping. I
8      don't know if it came off that fitting or
9      whatever.
10 Q.  Did you ever talk to anybody that day about what had
11     happened?
12 A.  No.
13 Q.  Did you overhear anybody talking about what the cause
14     of the fire was?
15 A.  The arson inspector, I heard him discussing it with
16     some of the Seacor management. He said that
17     that looked like the probable cause, the hose.
18 Q.  The hose of the compressor?
19 A.  That the hose of the compressor was the start of the
20     fire.
21 Q.  Do you know how long it was before the fire was
22     discovered by you that someone was last in the
23     engine room?
24     MR. RUFTY:
25         Calls for speculation.

55

1  A.  No.
2  Q.  No clue?
3  A.  No.
4  Q.  Did you ever walk into the engine room before the
5      fire while the vessel was in the DP mode?
6  A.  No. Specify that question. That day or --
7  Q.  No, sir, anytime.
8  A.  I had been down there.
9  Q.  And had you ever seen the stern thruster in
10     operation?
11 A.  The engine running, yes.
12 Q.  And did it have vibrations when it ran?
13 A.  Not that I could detect.
14 Q.  When you went down into the engine room a day or two
15     after the fire, after the fire inspector and
16     the arson inspector had been down there, did
17     the compressor hose look similar to what's
18     depicted in PE-4A, which is an exhibit from
19     Houma Fabricators' deposition?
20 A.  It was attached to the compressor, but it looked like
21     that.
22 Q.  When you went into the engine room after the fire --
23 A.  Do I really have to look at them?
24 Q.  Yes.
25 A.  I really don't want to.

56

1  Q.  But I have to --
2  A.  I understand.
3  Q.  I'll try to be brief. When you went into the engine
4      room after the fire, did you see these buckets
5      that are black in color in the area depicted in
6      PE-10?
7  A.  I don't remember seeing that.
8  Q.  Had you ever seen buckets like that shown in PE-10?
9  A.  No, sir.
10 Q.  Do you know if there were any flammable substances in
11     those buckets shown in PE-10?
12 A.  I have no idea.
13 Q.  Did you ever give a statement about what happened in
14     this fire?
15 A.  Yes, to the Coast Guard.
16 Q.  When did you give them that statement?
17 A.  The day we were back in port. We got back in port at
18     night, and the next day they came on board and
19     took statements.
20 Q.  Was it a handwritten statement?
21 A.  No. It was a verbal statement to them. They did all
22     the writing.
23 Q.  Did they have a tape recorder or anything?
24 A.  Not that I can remember.
25 Q.  After that, did you ever talk to anybody about the

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SEACOR MARINE AND                    NO. 00-0166
SEACOR OFFSHORE, INC.
                                     MAGISTRATE (1)
VERSUS

SECTION "S"
HOUMA FABRICATORS, A
DIVISION OF L.O.R., INC.,
AIR COMPRESSOR ENERGY
SYSTEMS, INC., DRESSER
INDUSTRIES, INC., and
LEROI INTERNATIONAL d/b/a
COMPAIR LEROI

        This is the deposition of JAMES BENYARD,

in the above-entitled cause, pursuant to the following

stipulation, before Paul Stahls, Certified Court Reporter,

authorized under the laws of the State of Louisiana to

administer oaths to witnesses, taken in the offices of

Harris & Rufty, 1450 Poydras Street, Suite 1510,

New Orleans, Louisiana, on the 10th day of January, 2001.

STAHLS & ASSOCIATES
CERTIFIED STENO AND VIDEO REPORTING
5304 ERLANGER ROAD
KENNER, LOUISIANA  70065
(504) 885-3684

---

2

## I N D E X

|                                         | Page |
|-----------------------------------------|------|
| Caption . . . . . . . . . . . . . . . . . . .  | 1 |
| Appearances . . . . . . . . . . . . . . . . .  | 3 |
| Stipulation . . . . . . . . . . . . . . . . .  | 5 |
| Examination By: |  |
|   MR. WALLACE . . . . . . . . . . . . . . | 5 |
|   MR. JOHNSON . . . . . . . . . . . . . . | 88 |
|   MR. McCARTHY . . . . . . . . . . . . . | 121 |
|   MR. KLEINMAN . . . . . . . . . . . . . | 134 |
|   MR. JOHNSON . . . . . . . . . . . . . . | 138 |
|   MR. WALLACE . . . . . . . . . . . . . . | 139 |
| Witness's Certificate . . . . . . . . . . . . . | 143 |
| Reporter's Certificate. . . . . . . . . . . . . | 144 |

Exhibits:

  No. B-1 (Ops/Preventive Maintenance, Section 4) . 35
  No. B-2 (Photos: PE-2, 5, 6, 10, 12) . . . . . . 78

---

3

APPEARANCES:

    HARRIS & RUFTY
    Attorneys at Law
    BY:  ALFRED RUFTY III, ESQ.
    1450 Poydras Street
    Suite 1510
    New Orleans, Louisiana 70112

        Representing the Plaintiffs,
        Seacor Marine, Inc. and
        Seacor Offshore, Inc.


    CHAFFE, McCALL, PHILLIPS, TOLER & SARPY
    Attorneys at Law
    BY:  CAMPBELL E. WALLACE, ESQ.
    1100 Poydras Street, 23rd Floor
    New Orleans, Louisiana 70163

        Representing the Defendants,
        LeRoi International d/b/a CompAir
        LeRoi and Dresser Industries


    YOUNG, RICHAUD, THEARD & MYERS
    Attorneys at Law
    BY:  C. BLAISE McCARTHY, ESQ.
    1515 Energy Center
    1100 Poydras Street
    New Orleans, Louisiana 70163

        Representing the Defendant,
        Air Compressor Energy Systems, Inc.


    HULSE & WANEK
    Attorneys at Law
    BY:  RANDALL L. KLEINMAN, ESQ.
    1010 Common Street
    Suite 2800
    New Orleans, Louisiana 70112

        Representing the Defendant,
        Hart Industries

---

4

APPEARANCES (Continued):


    JOHNSON, JOHNSON, BARRIOS & YACOUBIAN
    Attorneys at Law
    BY:  RONALD JOHNSON, ESQ.
    701 Poydras Street
    Suite 4900
    New Orleans, Louisiana 70139

        Representing the Defendant,
        Houma Fabricators


    WARD, NELSON & PELLETERI
    Attorneys at Law
    BY:  SUSAN LAPORTE, ESQ.
    1539 Jackson Avenue, 6th Floor
    New Orleans, Louisiana 70130

        Representing the Defendant,
        Gates Company


Also Present: MR. BEN C. HAVEMAN, Technical Maritime
                            Associates


Reported by:  PAUL STAHLS
             Certified Court Reporter

EXHIBIT

2

tabbies®

13

1  Q.  Okay.  And are you currently employed by Seacor?
2  A.  Yes.
3  Q.  Which vessel are you assigned to?
4  A.  I'm on the VENTURE, the SEACOR VENTURE.
5  Q.  All right.  Have you ever been arrested?
6  A.  Yes.
7  Q.  Have you ever been convicted of any felonies?
8  A.  No.
9  Q.  Okay.  Have you ever given a deposition before?
10 Q.  Something like this?
11 Q.  Yes.
12 A.  No.
13 Q.  Have you ever given testimony in a courtroom?
14 A.  Yes.
15 Q.  In what kind of case?
16 A.  I can't -- I'D have to think about it.  Probably in
17     high school or something like that.
18 Q.  Was it involving some trouble you had gotten into in
19     high school or something?
20 A.  Friends, yes.
21 Q.  In the last ten years, you have not been convicted of
22     any felony?
23 A.  No.
24 Q.  As far as you know you have never been convicted of
25     any felony.

14

1  A.  Right.
2  Q.  By the way, I have to ask everybody these questions,
3     All right?  Who is your boss when you were
4     aboard the GALAXY?
5  A.  Allen Townsend.
6  Q.  And what was his position?
7  A.  He is the chief engineer.
8  Q.  Was anyone else in the Engineering Department aboard
9     the GALAXY beside yourself and Al Townsend?
10 A.  At the time when I was on the boat it was just me and
11     him.
12 Q.  Who was the relief crew opposite Al Townsend and you,
13     just in terms of the Engineering Department?
14 A.  When I said -- when I was on the GALAXY, one guy
15     relieved Allen, I think maybe once or twice, for
16     maybe a week or so, but that's it.  He usually
17     worked maybe ten to eleven months out of the
18     year.
19 Q.  Oh, he did?
20 A.  Yeh.
21 Q.  And would you work the same?
22 A.  I worked -- usually I was working then a 28-14, or
23     maybe I would do a little over 28 days some of
24     the time.
25 Q.  Okay, and when you were off duty who was the

15

1     assistant engineer for the GALAXY?
2  A.  Allen Townsend.
3  Q.  So they would just have one engineer.
4  A.  Right.  We was working opposite each other.
5  Q.  Okay.  Al Townsend was the chief engineer?
6  A.  Exactly, and I was the assistant.
7  Q.  You were the assistant.  Now when you would be off 14
8     days, who would work in your place?
9  A.  I wouldn't know the guy.
10 Q.  Okay.  And did you routinely work 28-14 from the
11     first part of '98 until the last part of January
12     of '99 when the fire occurred?
13 A.  Yes.
14 Q.  Do you know of any other chief engineers besides Al
15     Townsend who worked on the GALAXY during that
16     time period?
17 A.  I guess one other.
18 Q.  But you don't remember his name right now?
19 A.  I remember his name, but the guy who relieved me I
20     wouldn't remember.
21 Q.  Right.  What was the name of that other chief
22     engineer?
23 A.  Roy Allen.
24 Q.  Roy Allen?
25 A.  Right.

16

1  Q.  Did anybody aboard the GALAXY have any
2     responsibilities to do anything on a daily basis
3     in the engine room besides you and Al Townsend,
4     when you were working as the chief engineer and
5     the assistant engineer?
6  A.  No one else was allowed in the engine room.  Even the
7     captains didn't even come in.
8  Q.  Okay.  What were your job responsibilities as first
9     engineer aboard the GALAXY?
10 A.  Basically, I assisted Allen in anything he needed me
11     to be doing, any work that needed to be done.
12     There were work lists of basically mostly
13     cleaning.  That's the only thing he really liked
14     assistance with really, was the cleaning.
15 Q.  Okay, and when you say cleaning, what do you mean by
16     that?
17 A.  I was known for keeping a real clean engine room,
18     making sure the bulkheads was wiped down, and
19     maybe paint different valves on the ballast
20     system, making sure the deck was shiny, things
21     of that nature.
22 Q.  Okay.  Did you have any daily checklist of things you
23     were supposed to do as first assistant engineer
24     on the GALAXY?
25 A.  First thing I do was make sure I do a visual

17

1 inspection of the engine room.
2 Q. Okay. What time would your day start?
3 A. Approximately 8 o'clock in the morning.
4 Q. When you say a visual inspection, what were you
5 looking for on this daily inspection?
6 A. Anything abnormal as far as the engineering plant,
7 any leaks, any abnormal noises, anything like
8 that. If we was running, different noises
9 equipment might make, if we were shut down, just
10 daily leaks of maybe something leaking prior to
11 something being shut down before, things like
12 that.
13 Q. Okay. And if you found something abnormal, would you
14 record that in the log or would you tell Allen
15 about it? What would happen if you found
16 something abnormal?
17 A. Any problems, I would tell to chief and he'd usually
18 take care of whatever needed to me done. He did
19 all the logging.
20 Q. Did you do any logging?
21 A. No.
22 Q. What did you understand he would log in the engine
23 room log?
24 A. I would have no idea what.
25 Q. Okay. After you did your visual inspection every

18

1 morning around 8:00 in the morning, what would
2 you then do as part of your daily routine?
3 A. It would depend on what day it is. If it's like
4 Monday, maybe I have to grease the valve
5 thruster, the fittings in there, greasing
6 certain fittings, and most of the time cleaning
7 and painting.
8 Q. Cleaning and painting?
9 A. Right. Every day was cleaning and painting. every
10 day.
11 Q. Okay. Were there any other routine activities that
12 you would do on a daily basis besides what you
13 described as the visual inspection, identifying
14 leaks, abnormal noises, greasing, cleaning and
15 painting?
16 A. He had a maintenance board on the GALAXY and I
17 followed that, and that many years ago I can't
18 recall what exactly what I was doing. I've been
19 with other engineers and they do things a little
20 different, so I can't recall, but I know he had
21 a pretty good maintenance program, and I can't
22 recall exactly how he wanted to do this and
23 that, I just know greasing, painting and stuff
24 like that.
25 Q. All right. Now what about handling fuel, did you do

19

1 any of that?
2 A. No, sir. I was not allowed to come near any type of
3 fuel.
4 Q. Any when you say you cleaned, what would you clean in
5 the engine room?
6 A. He liked the EMD's wiped -- he liked everything in
7 his engine room wiped, really -- so I stayed on
8 top of making sure that if there was any excess
9 grease anywhere, I wiped that up.
10 Q. You mentioned MD. What is that?
11 A. EMD. Those are the engines that they used.
12 Q. What does that stand for?
13 A. I don't know.
14 Q. Are those the two main engines for propulsion?
15 A. Exactly.
16 Q. So you'd paint those engines?
17 A. Right.
18 Q. Did you ever paint the bow thruster.
19 A. Yes.
20 Q. Did you ever paint the stern thruster?
21 A. I don't think so.
22 Q. When you would paint, what type of paint were you all
23 using? I don't mean the brand name but, I mean,
24 was it --
25 A. Engine room white. Whatever Seacor requires for us,

20

1 the white paint they wanted to use on their
2 vessels, that's what we used.
3 Q. Okay. Do you remember the brand name or the type?
4 A. No.
5 Q. Okay. What would you do with the paint can while you
6 would paint?
7 A. What would I do with them?
8 Q. Would you open them up and use a brush to paint, or
9 spray paint, or how would you do that?
10 A. I always did paint with a hand brush. A hand brush,
11 and I painted with my hand, everything I did.
12 We had a level where we mixed our paint outside,
13 and I'd go down there with my paint can and my
14 paint brush, and when we finished with that we'd
15 take it back to what we call the paint locker.
16 Q. Where was the paint locker located?
17 A. I believe on the 01 level outside.
18 Q. And what did you store in the paint locker?
19 A. Paint, brushes, thinner, everything in a certain area
20 that we keep paint stuff at.
21 Q. You also said that you cleaned on a daily basis.
22 Could you describe what you cleaned and what
23 materials you used to clean the engine room
24 parts.
25 A. Soap and water.

89

1 Q. Now, you had said earlier that you stayed on the
2   GALAXY about a month after the fire, is that
3   right?
4 A. Right.
5 Q. All right. Why were you aboard during the month
6   after the fire? What were you doing during that
7   time?
8 A. Okay, I'm misunderstanding. After the fire -- you
9   asked me did I come back after the fire?
10 Q. Well, it was my understanding -- correct me if I am
11   wrong and we will try and straighten it out, but
12   I got and made a note that you told Mr. Wallace
13   that you stayed aboard the GALAXY a month after
14   the fire. Now I may have misunderstood that,
15   and if I did, tell me.
16 A. I didn't mean it like that. I don't know how he said
17   it but after the fire I don't think I -- well,
18   yes, I think I did stay a month afterwards
19   because I got off that boat maybe in February.
20   Yeah, I came back for one more hitch, yes, you
21   are correct.
22   (Off-the-record discussion.)
23 BY MR. JOHNSON
24 Q. Were you aboard when the vessel was towed to port?
25 A. After the fire?

90

1 Q. Yes, sir.
2 A. Yes I was.
3 Q. All right. When the vessel was docked, did you stay
4   aboard, and if so, for how long?
5 A. I think maybe a day or so.
6 Q. Then you went home?
7 A. Yes, I believe so.
8 Q. When you came back after fourteen days or whatever
9   time you were off, did you go to the GALAXY or
10   did you go to some other vessel?
11 A. I think I went to another vessel.
12 Q. Why were you told that you were to go to another
13   vessel?
14 A. I just -- I don't -- I just think they put me on
15   another one. I can't remember how I ended up on
16   another vessel at the time.
17 Q. Did you ever know or ever learn that Allen had asked
18   that you be removed from the GALAXY before the
19   fire?
20 A. Yes.
21 Q. How did you learn that?
22 A. It was a problem, if I remember.
23 Q. A problem you had with Allen?
24 A. The way Allen was treating me, yes.
25 Q. I'm sorry?

91

1 A. The way Allen was treating me, yes.
2 Q. Okay, but I'm asking you what you learned about being
3   asked to be removed from the vessel. Did Allen
4   tell you that? Did the captain tell you about
5   that? Did some other employee of Seacor tell
6   you that he didn't want you aboard the vessel
7   with him?
8 A. It didn't happen like that.
9 Q. All right. I'm just trying to find out how it did
10   happen.
11 A. I can't remember if it was before or after, but we
12   met with personnel and me and Allen had a
13   disagreement about how he was towards me, and
14   during the time, I don't know if it was before
15   or after, but --
16 Q. Before or after what, the fire?
17 A. Right. They ask him did he want me to come back and
18   he said yes, but the very next hitch the same
19   problem occurred, and they did not bring me back
20   to the vessel.
21 Q. After the fire?
22 A. Right.
23 Q. So the meeting you had with personnel was before the
24   fire, before the hitch you started?
25 A. Exactly.

92

1 Q. And you were on the boat about a month before the
2   fire?
3 A. Right.
4 Q. So this would have been in your time off, say more
5   than a month before the fire?
6 MR. RUFTY:
7   I'm sorry. What is the "this?"
8 MR. JOHNSON:
9   The meeting with Personnel. Excuse me.
10 A. Yes, I think so. Yes, I think I went home in
11   December and I believe I was off like Christmas
12   and New Year's, and came back after New Year's,
13   right after New Year's, and I think the fire was
14   the end of that month, if I remember.
15 Q. That's correct.
16 A. And I didn't come back after that.
17 Q. That's correct. All right. Now, you may not be
18   familiar with this, but -- and I'm going to ask
19   you just look at this -- but the engineer's log
20   on January 26th shows that Allen complained to
21   the captain that you were not doing what he told
22   you to do and that you were hanging out with the
23   AB Scotty Hawthorne. Is it Hawthorne
24   (pronunciation)?
25 A. Yes.

93

1  Q.  Did they tell you in the meeting with Personnel, say
2       the month before that, that that was the problem
3       that you had with Allen, that he didn't think
4       you were doing what he told you to do?
5  A.  I believe so.
6  Q.  Did he make any specific complaints to you about what
7       you were not doing when he asked you to do
8       things?
9  A.  No, not at all.
10  Q.  Did he ever complain to you about not doing the
11       painting that you were supposed to do?
12  A.  One particular incident where it started, it was that
13       he had did some welding and he asked me to do
14       some painting, and I painted the bracket that he
15       had me paint, but some spots, I guess, under
16       there -- you know how the arcs from the welding
17       leave a little spots and stuff -- I didn't see
18       it and I missed it, and he nit-picked on that.
19  Q.  Jamie, did you and Allen ever have words?
20  A.  Yes, we had words.
21  Q.  How often?
22  A.  Not much.
23  Q.  Was he getting on your case at times?
24  A.  Allen barely talked to me, if you want to be direct,
25       you know.  He never -- I mean everybody that I

94

1       come across said pretty much the same.  He treat
2       everybody the same way, so me, as far as
3       singling me out, he treated everybody the same
4       way.
5  Q.  He was the same way with everybody.
6  A.  Exactly.
7  Q.  Did you feel he treated you fairly?
8  A.  He stopped treating me fair after he learned that I
9       was upgrading my license, and, I don't know,
10       like I was some type of -- like I was going to
11       try to take his place, but after that -- you
12       know, because that's why I left early after the
13       fire, because I had a Coast Guard appointment to
14       upgrade my license.
15  Q.  So you were trying to get your chief engineer's
16       license?
17  A.  Right, I was, during that time.
18  Q.  Did you get it before the fire?
19  A.  No.
20  Q.  But you had tried to get it?  You had applied for it?
21  A.  I was working on it.  I was going to upgrade it and I
22       had an appointment, and he figured once I came
23       back to that vessel that -- I mean, I'm trying
24       -- I'm confused.  I don't know if this is about
25       the fire, about the Personel stuff that we had,

95

1       that me and Allen had going on, but you know,
2       I'm trying to avoid, you know, this side of it,
3       but you're bringing it to the table.
4  Q.  I don't know if it may be related, all right, so I've
5       got to ask those questions, and all I ask you to
6       do is answer my questions as honestly as you
7       can.
8  A.  Okay, yes, and after that he felt that, you know, he
9       don't want me on that boat, because at the time
10       that the oil field was getting kind of tough,
11       and they was putting us on schedules, and he
12       felt since I knew the boat -- because nobody
13       else could work with him, and I was the only
14       person that could work with him, so once he got
15       rid of me, I mean, it would just be him because
16       he's the only one knew that boat.  A Dowell boat
17       is a special boat.  It's not like any other boat
18       at Seacor.  I mean, it takes somebody with some
19       type of knowledge to know what's going on about
20       that vessel.
21  Q.  Did he ever help you learn anything more about the
22       boat?
23  A.  No, he didn't teach me nothing.  Like I said, my
24       general job on that boat was to clean.
25  Q.  Is that ordinarily what the assistant engineer does,

96

1       or do you know?
2  A.  No, that was the problem at the meeting that we had
3       prior to that, you know.  I mean, the Personnel
4       manager was there and, you know, the meeting was
5       about basically teaching and learning to work
6       together and stuff like that.
7  Q.  You raised the question that you weren't learning how
8       to do anything more in the engine room than just
9       clean, and that you felt you should be learning?
10       Did you raise that?
11  A.  Yes, I did.
12  Q.  Now, I'm going to go through some of the entries in
13       the engineer's log, and you may not be familiar
14       with the log, but I'm going to ask you whether
15       or not you were familiar with what was going on
16       at the time, okay?
17  A.  All right.
18  Q.  This is December 22, 1998.  There is an entry that
19       appears to me from my reading of it that
20       "repaired oil leak number one generator --
21       cracked oil line."  Jamie, do you know anything
22       about that?
23  A.  Not at all.
24  Q.  Did you help in any way to do that work, to repair
25       that leak?



# Unified
Investigations & Sciences, Inc.

## UNIFIED INVESTIGATIONS & SCIENCES, INC.
3501-I Distributors Row
New Orleans, LA  70123
504-733-3848

## PRELIMINARY REPORT
### PRIVILEGED AND CONFIDENTIAL

February 22, 1999

| | |
|---|---|
| INVESTIGATIVE REPORT: | Cause & Origin of Fire M/V Galaxie |
| PREPARED FOR: | Ms. Mary Liles SECOR Marine, Inc. 5005 Railroad Ave. Morgan City, LA  70380 |
| INSURED: | M/V Galaxie |
| DATE OF LOSS: | January 30, 1999 |
| LOSS LOCATION: | Gulf of Mexico, LA |
| POLICY NO.: | N/A |
| CLAIM NO.: | N/A |
| UIS FILE NO.: | LA01-00437 |

This report is furnished as privileged and confidential to the
addressee, release to any other company, concern or individual is
the sole responsibility of addressee.

EXHIBIT
3

LA01-00437
page 2

1. SUBJECT OF REPORT:

Conduct a cause and origin investigation of the fire that
occurred on the date of loss in the engine room of the M/V
"Galaxie" while in operation in the Gulf of Mexico.


2. BACKGROUND:

It has been reported to this investigator that the M/V "Galaxie"
had been on location in the Gulf of Mexico performing Dynamic
Positioning operations since 7:30 p.m., when on or about 11:30
p.m. a noise was heard in the engine room and smoke was detected.
Mr. Allen Townsend, the vessel's Chief Engineer, reported that
both Main Engines, the Stern Thruster, Bow Thruster and Bulk Mud
Compressor were in operation at the time of the occurrence.  Mr.
Allen Townsend did not notice anything unusual while in the
engine room fifteen minutes prior to the detection of the fire.
Mr. Townsend proceeded to shutdown the engine room ventilation
system and louvers.  The lack of oxygen in the engine room put
the fire out.  The engine room was cool enough to be entered
approximately one hour after the fire auto-extinguished.

The M/V "Galaxie" is a 220 foot Supply Vessel built by Houma
Fabricators, Hull 78, in 1997.  Reportedly, the fuel filters for
all machinery room engines had been changed, as part of the
schedule maintenance of the vessel, on January 15, 1999 with
roughly 113 hours usage on the existing filters.

The Bulk Mud Compressor was manufactured by LeRoi International.
The subject compressor was reportedly shipped as a unit, on a
skid, to the local distributor Air Compressor Energy Systems of
Baton Rouge, LA.  The compressor was installed on the vessel and
fitted with piping and electrical connections by the shipyard,
Houma Fabricators. Reportedly, the compressor had been in
operation for about one (1) hour prior to the occurrence. The
total recorded operating hours for the Bulk Mud Compressor were
in the order of 28 hours.


3. BASIS FOR CONCLUSIONS:

    3.1.  Vessel inspection
    3.2.  Interview with Mr. Allen Townsend (M/V "Galaxie")
    3.3.  Discussion with Mr. Todd Dufrene (SECOR)
    3.4.  Evaluation of fire scene
    3.5.  Examination of Bulk Mud Compressor and components

LAO1-00437
page 3

4. CONCLUSIONS:

It is our preliminary conclusion that the fire originated at the
LeRoi Bulk Air Compressor installed in the engine room of the M/V
"Galaxie". The cause of the fire was a compromised oil injection
hose at the compressor fitting end. The pressurized heated oil
mist ignited and flashed to the source of the breach (the hose),
resulting in the generation of heat and smoke within the confines
of the engine room.

5. DISCUSSION:

   5.1. FIRE SCENE INSPECTION

An evaluation of the vessel revealed that the fire was confined
to the engine room. The lowest and worst burned patterns were
noted in the Bulk Mud Compressor skid. The oil injection from
the oil filter housing to the compressor was found breached at
the fitting on the compressor end. The rubber portion of the
hose was totally consumed by the fire. The only remains of the
hose was the metal reinforcing braid. The braid was disconnected
from the fitting at the compressor end. The compressor end of
the braid exhibited some extreme heat stress from intense fire
burning conditions. The air/oil separator sustained some heavy
charring of the painted vessel surface and components in the area
adjacent to the breached hose. The insulation of the exhaust
pipes directly above the compressor sustained considerable fire
damage.

The heat and smoke generated from the ignited compressor oil
caused the melting of the stern thruster fuel oil pressure
sending switch unit, located at the secondary fuel filter
housing, on the port side of the thruster engine. This condition
allowed pressurized fuel oil to spray and ignite causing a
subsequent, secondary fuel fed fire along the port side of the
Stern Thruster engine. Although, this fire was smaller in nature
than the compressor fire, it generated enough heat to compromise
numerous adjacent electrical equipment and wiring.

   5.2. EXAMINATION OF BULK COMPRESSOR

An examination of the LeRoi compressor, at the facility of Air
Compressor Energy Systems in Baton Rouge, LA, was conducted on
February 18, 1999. A dismantling of the compressor revealed that
the bearing caging on both the discharge and suction side had
melted.

LA01-00437
page 4


The air suction filter sustained extreme charring of the filter
element.  The rotary screw components visually appeared to be in
satisfactory condition.  The oil/air separator was dry with no
residual oil in the tank.  The baffle located at the air inlet
side of the separator exhibited heavy heat damage.  Some heavy
carbon deposits were observed inside the separator receiver.  An
examination of the oil filter wire mesh element did not reveal
any evidence of metal residue indicating a mechanical failure of
the compressor.  The wire mesh screen was relatively clean of
carbon debris but it had no oil remaining inside the filter
enclosure.


6.0 ANALYSIS:

A full and comprehensive analysis of the failure modes that
resulted in the causation of the fire will be conducted upon
completion of a forthcoming metallurgical evaluation of the
failed Bulk Mud Compressor oil injection hose.

A full photographic presentation of the fire scene and Bulk Mud
Compressor components will be submitted with the final report.



The conclusions expressed in the body of this report may be
reconsidered and revised if new evidence or information becomes
available that merits such consideration.

This investigative report is made without prejudice to the rights
and/or interests of any party involved with this claim or case.


                              Respectfully submitted,


                              George F. Casellas, CFEI
                              Marine Engineer

12/27/00  15:35 FAX 504 525 ._22        HARRIS & RUFTY                    ☑003/003

 # BUSCH and ASSOCIATES, INC.

187 Northshore Place • Suite B                      PH: (334) 968-3791
Gulf Shores, Alabama  36542                         Fax (334) 968-3792

December 22, 2000

Alfred J. Rufty III, Esq.
Harris & Rufty, L.L.C.
Suite 1510
1450 Poydras Street
New Orleans, Louisiana 70112-6050

    Re:  SECOR Marine, Inc.
        M/V GALAXIE
        Oil Hose for 150SSM
        BAI Project 9932

Proposed Testing of a Gates C5C Hose Sample

A 12" long piece of 1 13/16-inch Gates 32C5C braided hose was delivered to this laboratory on 13 December 2000.  This hose is reportedly similar to the burned hose removed from the M/V GALAXIE.   Then on 21 December 2000 a 5-gallon container of CompAir LeROI SSL-50 Compressor Lubricant, Part No. 204-1584-5, Lot No. 201836, was delivered to this laboratory.

The hose material will be analyzed to determine the compound(s) from which it was manufactured and the chemical content of the compound(s).  The hose material will also be tested to ascertain its physical properties.  The above-referenced compressor fluid will be analyzed for its chemical content.

A hose sample will then be exposed to the above compressor lubricant for determining the lubricant effects, if any, on the hose material's chemical content and/or physical properties.

It was reported that the hose material was manufactured from nitrile elastomer.  If this is confirmed by testing, then the hose is not recommended for use with phosphate ester hydraulic fluid.

Upon completion of the tests, a report detailing the results will be prepared.

    Respectfully submitted,

    Courtney C. Busch, P. E., Ph. D.

CCB:g        MECHANICAL AND METALLURGICAL ENGINEERING CONSULTANTS

EXHIBIT
4



# BUSCH and ASSOCIATES, INC.

2332 SEVERN AVENUE    •    METAIRIE, LOUISIANA 70001    •    TELEPHONE (504) 835-8441

November 29, 1999

Rufus C. Harris, III, Esq.
Harris & Rufty, L.L.C.
Suite 1510
1450 Poydras Street
New Orleans, Louisiana 70112-6050

Re:    SEACOR Marine, Inc.
       M/V GALAXIE - Oil Hose for 150SSM
       BAI Project 9932

On 25 February 1999, Mr. George Casallas delivered to this laboratory the following items reportedly removed from the M/V GALAXIE:

1) a flexible hose approximately 30 inches in total length, with coupling
2) a filter and filter housing, and
3) a fuel oil sensor.

This laboratory was requested to determine, if possible, the cause(s) of the failure of the hose.

The flexible hose was badly burned, and one fitting was detached from it. Stamped on the separated fitting was "24, 2405-1 3/8"; no other markings were found. Most of the rubber and fiber material was burned from the hose. Burned debris, however, was found within the annulus formed by the outer and inner walls of both the detached and attached fittings.

An exemplar hose received by this laboratory was also examined. Marked on the fittings was "A, 1212=A." The flexible hose body was identified by "24 AOP 0399 Made in USA."

Both the burned hose and the exemplar hose were tested on 26 May 1999. The chemical content of the debris removed from both ends of the burned hose was compared with the exemplar hose material. The approximate chemical content of the debris removed from the

MECHANICAL AND METALLURGICAL ENGINEERING CONSULTANTS

 BUSCH and ASSOCIATES, INC.
Mechanical And Metallurgical Engineering Consultants

Rufus C. Harris, III, Esq.
Harris & Rufty, L.L.C.
Re:     SEACOR Marine, Inc.
          M/V GALAXIE - Oil Hose for 150SSM
          BAI Project 9932
Page 2
November 29, 1999

recess of the fittings of the subject hose was similar. The chemistry was also similar to the outer layer of rubber material on the exemplar hose. It appears therefore that the fitting was not separated from the hose prior to the fire.

Because of the extensive fire damage, the cause(s) of the hose failure could not be determined.

                         Respectfully submitted,

                         Courtney C. Busch, P. E., Ph. D.

CCB:g

