147382

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 MAR 22  P 4: 47

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SEACOR MARINE, INC. AND SEACOR OFFSHORE, INC. | CIVIL ACTION |
| VERSUS | NO. 00-0166    SECTION S (1) |
| HOUMA FABRICATORS, A DIVISION OF LOR, INC., AIR COMPRESSOR INDUSTRIES, INC., AND LEROI INTERNATIONAL, INC. D/B/A COMPAIR/LEROI | JUDGE LEMMON<br><br>MAGISTRATE JUDGE SHUSHAN |

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION
### FOR SUMMARY JUDGMENT FILED BY HOUMA FABRICATORS

NOW COMES Defendant, Houma Fabricators, a Division of LOR, Inc. ("Houma

Fabricators"), and to supplement its Memorandum in Support of Motion for Summary

Judgment submits the following the arguments and authorities:

**I.    PROCEDURAL BACKGROUND.**

Houma Fabricators and Seacor filed Cross-Motions for Summary Judgment

regarding the legal issues arising from Seacor's First Supplemental and Amending

Complaint for Damages. At the hearing on these various motions, the Court instructed the

parties to specify those causes of action that still remained arguably viable after the

completion of considerable discovery.

As to Houma Fabricators, the following contentions remain: (1) that the vessel built

by Houma Fabricators contained a redhibitory defect due to a faulty compressor hose; (2)

that the Shipbuilding Contract was breached through Houma Fabricators' failure to

indemnify Seacor for property damage; (3) that Houma Fabricators committed a maritime

1

tort by damaging Seacor's "other property" within the meaning of the *East River* doctrine; and (5) that Houma Fabricators breached an implied warranty of fitness for a particular purpose when the compressor hose failed.  The Court has ordered supplemental briefs to address certain questions raised during the oral arguments and to allow the parties to further clarify their positions with respect to these allegations.

As will be demonstrated below, Seacor has no cause of action against Houma Fabricators based on any federal or state law remedy, including redhibition, breach of an implied warranty or breach of contract.  Accordingly, Houma Fabricators' Motion for Summary Judgment should be granted and the First Supplemental and Amending Complaint filed by plaintiff, Seacor, should be dismissed with prejudice.

## II.    DISCUSSION.

### A.    *East River* "other property" exception.

This topic has been thoroughly briefed as to the legal issues.  Houma Fabricators has asserted that it has no liability under maritime tort because the plaintiff's sole remedy against the manufacturer of a vessel is in state law encompassing warranty.[1]  It has been Seacor's position that even if Houma Fabricators is immune from maritime tort for all damages to the engine room under the *East River* doctrine, it can still be held liable for the loss of the Plaintiff's "other property": the stern-thruster engine Seacor separately purchased and had Houma Fabricators install prior to delivery of the vessel. The other property exception allows a plaintiff to recover for the loss of equipment or other items added to the vessel <u>after</u> the initial sale.[2]  Houma Fabricators has maintained that while

---

[1] *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858 (1986).

[2] *Saratoga Fishing Co. v. J.M. Martinac & Co.,* 520 U.S. 875, 877 (1997).

Seacor may have purchased the stern-thruster separately, Houma Fabricators installed it into the vessel prior to sale as a result of a change order. The Shipbuilding Contract warranty extended to the stern-thruster engine and the *East River* doctrine applies to the stern-thruster as well.

The attached testimony by Butch Monnier,[3] a Vice President of Houma Fabricators, demonstrates that Seacor looked to Houma Fabricators for repairs to the stern-thruster engine while the contractual warranty period was in effect, but now seeks to categorize it as "other property" because the fire occurred after the warranty period expired. At his deposition Mr. Monnier was asked whether Seacor had ever returned the vessel for repairs due to vibration problems with the stern-thruster. Although the stern-thruster had been tested on sea trials and "performed flawlessly" a heavy vibration in the stern thruster engine developed after Seacor took delivery. Seacor brought the vessel back to Houma Fabricators for repairs under the warranty provision of the Shipbuilding Contract. It was discovered that the vessel crew had used the stern-thruster to keep the vessel up against the bank while riding out a storm and had caused the tail shaft to become twisted. Realizing that the damage was due to crew negligence and not covered by the warranty, Seacor ultimately paid for the repairs. It is very clear from this testimony that Seacor did not think of the stern-thruster engine as "other property" when making a claim within the warranty period. However, now that the warranty has expired, they contend it is "other property" for purposes of collecting tort damages. Neither the case law nor their actions support Seacor's position. This incident further supports Houma Fabricators' contention

---

[3] See attached Exhibit 1, Monnier Deposition transcript.

that the stern-thruster was subject to the terms of the original contract and cannot be treated as other property within the meaning of *East River*.

Finally, it should be noted that the Builder's Risk Policy supplied by Houma Fabricators pursuant to the Shipbuilding Contract specifically covered this stern-thruster: "this endorsement will cover the Contract Change Orders and Customer Furnished Equipment to an agreed value of $1,812,388.99 of the Galaxie Marine 200' vessel."[4]   This demonstrates that the stern-thruster was considered an integral part of the Shipbuilding Contract, for which Houma Fabricators bore the risk of loss prior to delivery.  These facts suggest only one conclusion: that the object of the contract between Houma Fabricators and Seacor was one entire vessel, including a stern-thruster engine, and Seacor cannot make a claim in maritime tort for its loss.  Seacor's sole claim is for breach of warranty under Louisiana law, as will be explored below.

**B.    The shipbuilding contract is not a sales contract subject to Louisiana redhibition law.**

In addition to the maritime tort allegations, Seacor's Amended Complaint asserts a claim based on the redhibition statutes under Louisiana law.  Civil Code article 2520 provides that a seller warrants a buyer against defects in a thing sold when such defect renders the thing useless or so inconvenient that it must be presumed that the buyer would not have bought the thing had the defect been known.  Houma Fabricators asserted in its Memorandum in Support of Motion for Summary Judgment that the Shipbuilding Contract was not a sales contract subject to the redhibition statute, but a contract to build.

---

[4] See attached Exhibit 2, Builder's Risk Policy, p. 16, Endorsement No. 4.

The test for establishing a building contract is enunciated in *Duhon v. Three Friends Home Builders Corp.*[5]    A building contract requires that: (1) the party receiving performance has control over the specifications; (2) the negotiations take place before the object is constructed; and (3) one party will supply the materials as well as the skill and labor to build the object of the contract.[6]  It is uncontroverted by the plaintiff that Seacor had control over the specifications of the vessel; that Houma Fabricators and Seacor negotiated the contract prior to its commencement, and that Houma Fabricators supplied the skill, labor and materials to supply the vessel.  These facts are established by a simple review of the Shipbuilding Contract.

Under Article I, the vessel owner had final approval of the specifications.  The contract was negotiated and signed prior to construction, as reflected in Article III, relating to terms of payment.  Article III required 5% payment within 5 days of the signing of the contract and 15% payment at the start of construction.  Finally, Article I required Houma Fabricators to supply all labor, tools and materials to construct the vessel.  All three elements of the *Duhon* test are satisfied in the present case.  Finally, the fact that the contract is for the construction of a ship, rather than a house, should not make any difference in the analogy. A "building contract" is not restricted to the construction of buildings.[7] Because the contract is one for a work by the job, the plaintiff has failed to state a cause of action in redhibition.

---

[5] 396 So.2d 559 (La. App. 3d Cir. 1981).

[6] *Id.* at 561.

[7] *Id.* at Footnote 8.

The distinction between sales and building contracts is actually found in the Louisiana Civil Code.[8]   Article 2439 defines a sale as "a contract whereby a person transfers ownership of a thing to another for a price in money." A building contract is defined by Article 2756, which states "[t]o build by a plot, or to work by the job, is to undertake a building or work for a certain stipulated price."  Differentiating between the two types of contract can result in several important ramifications, including the applicable prescriptive date, the burdens of proof and the applicable damages.[9]   A party cannot collect attorneys' fees for a breach of a building contract.[10]  Further, redhibition is a remedy that is only applicable to a sales contract.[11]

The distinction between a sales and a building contract goes to the very basic principles of obligations.  In Louisiana law, the object of the performance of the contract is the standard for classifying obligations.  Under the Civil Code there are essentially three types of obligations: to give, to do, and not to do.[12]  The obligation to give is where an obligor is bound to transfer ownership of a thing to an obligee, as in a contract of sale.[13]  The obligation to do arises when the obligor is bound to carry out an act such as the manufacture of some object.[14]

The obligations to give and to do are also contrasted by their placement within Book III of the Louisiana Civil Code—"Of the Different Modes of Acquiring the Ownership

---

[8] Lee Ayres, *The Distinction Between a Building Contract and a Sale,* 47 La. L. Rev. 821 (1987).
[9] *Id.* at 834-838.
[10] *Id.* at 838.
[11] *Id.* at Footnote 14.
[12] Saul Litvinoff, *Louisiana Civil Law Treatise, The Law of Obligations,* Vol. 5, §1.4 (West Publishing Co. 1992).
[13] *Id.*

of Things."  However, the sales contract definition is found in Title VII, relating to Sale, in Chapter 1 entitled "Of the Nature and Form of the Contract of Sale."  Whereas, the building contract definition is found in Title IX relating to Lease, in Chapter 3, Section 3 entitled "Of Constructing Buildings According to Plots, and Other Works by the Job, and of Furnishing Materials."  Finally, the articles on redhibition are included in Title VII relating to Sale. Therefore, sales, including the redhibition articles, are within one part of the Code, while Building Contracts are within another part of the Code.  The structure of the Civil Code itself therefore demonstrates that the redhibition statutes are not applicable to the building contract articles because they are not included in the building contract section of the Code.

The object of the Shipbuilding Contract is obvious: to build a ship.  Particularly, a 200 foot offshore supply vessel.  Therefore, the obligation created by the contract is one to do: to carry out the manufacture of a vessel through the assembly of raw materials and component parts into a final product.  The contract is much more than the simple transfer ownership of the vessel from one party to the next, as is the object of a sales contract.

The foregoing demonstrates that the Shipbuilding Contract should be determined to be a contract to build within the reasoning of the case law, commentators and the code. The elements of the *Duhon* test are satisfied, and the Shipbuilding Contract meets the definition of a building contract within the meaning of the Civil Code and under the principles of obligations law   Accordingly, Civil Code Articles 2756 through 2777 should be applied to determine the rights of the parties in this instance.[15]   Because the redhibition

---

[14] *Id.*

[15] It should be noted that the Civil Code Articles related to building contracts specifically provide a privilege in favor of workmen who are employed in the construction or repair of

articles do not apply to a building contract, Seacor is unable to state a cause of action sounding in redhibition, and the statutory warranties and the damages applicable to redhibition cases are not applicable to the present case.  That portion of the plaintiff's Amended Complaint relating to redhibition claims against Houma Fabricators should therefore be dismissed.

**C.    The transfer of title under Article VI of the Shipbuilding Contract does not affect the categorization of the contract as one to build.**

At oral argument, the Court queried whether the passing of title between builder and owner pursuant to Article VI of the Shipbuilding Contract had any effect on the categorization of the contract as one for sale or to build.  For the reasons that follow, the passage of title provision has no effect on the categorization of the contract as one to build.

Article VI of the Shipbuilding Contract provides that:

> title to all work, materials and components performed on, installed in or placed on board the vessel or otherwise delivered to BUILDER'S yard or fabricated by the builder shall vest in OWNER immediately upon completion of such work, delivery to BUILDER'S yard materials or fabrication of such components, and payment for same by owner.

Essentially, to the extent materials are paid for by the progress payments made under Article III, title to those materials vests in the vessel owner despite the fact that the contract has not been completed.  The purpose of Article III is to address certain peculiarities of the law of obligations and the Civil Code.

---

ships under article 2777.  This privilege demonstrates that such contracts are meant to be encompassed by the building contract statutes.

It is a fundamental principle in the law of obligations that risk of loss normally passes to the obligee upon transfer of ownership even though neither delivery nor payment have occurred.[16] However, in the case of building contracts, the Civil Code contravenes the general rule that delivery is immaterial to ownership. In the event a building contractor furnishes the materials and the work is destroyed prior to its being delivered, the loss will be borne by the contractor.[17] On the other hand, if the contractor is not furnishing materials for the building, the owner will retain the risk of loss throughout construction.[18] Finally, if the work that is the subject of the contract is paid for by installments in proportion to the progress of the work, that portion of the work completed and paid for becomes the liability of the owner and delivery is presumed upon payment.[19]

Thus, as in the present case, in a contract to build where the owner supplies some materials and the owner supplies some others, and where the contract provides for progress payments, there is room for considerable confusion over who assumes the risk of loss and when. Article VI helps to clear up any confusion by vesting title or ownership in the vessel owner on payment, while reserving risk of loss to the builder. This is directly opposite to the scenario envisioned by the sales articles and in consonance with the articles on building contracts. Regardless of the passage of title to the individual materials, the object of the contractual obligation is not compete until delivery of the entire vessel.

---

[16] Saul Litvinoff, *Louisiana Civil Law Treatise, The Law of Obligations*, Book 2, §149, p. 271 (West Publishing Co. 1975) and LSA-C.C. art. 2456: "Ownership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid."

[17] LSA-C.C. art. 2758.

[18] LSA-C.C. art. 2759.

[19] LSA-C.C. art. 2760.

9

The ownership of the materials is also important for purposes of calculating taxes and insurance premiums during the year or more of construction. It is important that title to the materials be firmly established in the event the vessel owner declares bankruptcy or is sold during construction. The passage of title is important in the event creditors would seek to attach the property while a vessel was under construction.[20] As you can imagine, a company that paid hundreds of thousands of dollars in progress payments would be seriously dismayed if the vessel could be seized by the shipyard's creditors, without any recourse on the part of Seacor. For example, in *N. Levy & Son v. Paquette,* the Louisiana Supreme Court considered a case where creditors of a decamped contractor sought to attach the pilings of a seawall that had not been assembled into the finished product before the contractor's hasty departure. In holding that title to the pilings had already passed to the town of Mandeville, even though the seawall was unfinished, the Court observed:

> There is no inconsistency in the concurrent existence of a qualified ownership in one party, and a control and dominion over it . . . for certain purposes in another party. And it is evidently within the meaning of Article 2761 that, when a part of a work has been completed, delivered and accepted, and paid for, all the elements of ownership have been transferred to the 'proprietor' save only the right of the contractor to control such part to the extent necessary for the completion of the work.

The contractor's creditors therefore had no right in the partially finished property as the contractor no longer had any rights in it himself once he was paid..[21]

Finally, Article IX of the Shipbuilding Contract provides that risk of loss (as opposed to title) shall transfer to the owner upon delivery despite the passage of title under

---

[20] 80 So. 269 (La. 1918):

10

progress payments.  This provision expresses the concept inherent in the law of building contracts that it is only acceptance of delivery by the buyer that releases the contractor from the obligation to do.  Therefore, even though title to the materials has already passed to the owner, the obligation to do the building of the vessel has not been satisfied and remains outstanding until delivery to and acceptance by the owner.  It is delivery that is the key to completion of the obligation under a building contract, not passage of title.  Passage of title is really irrelevant to categorization of the contract as one of sale or redhibition.

Accordingly, the language contained in the article relating to transfer of title has no affect on the categorization of the contract as a building contract.  The transfer of title merely protects the vessel from seizure by creditors and clears any confusion on risk of loss created when interpreting the contract under the Code articles relating to building contracts.

> **D.    Houma Fabricators is not obligated to "indemnify" Seacor for its own property loss occurring after the delivery of the vessel, because the risk of loss was transferred to Seacor.**

At the hearing on the motions for summary judgment, much attention was paid to the plaintiff's speculative and unsupported theory that the Insurance and Indemnity article was unlimited and therefore encompassed the loss that is the subject matter of this lawsuit.  However, it defies logic and common sense that a shipbuilder would draft a one-year limitation on property damage in the warranty provision, yet at the same time agree to an indemnification clause that would extend the shipbuilder's liability for property damage beyond the warranty date or for an unlimited period of time.

---

[21] *Id.* at 275.

As background, it should be noted that there are three principles at operation in this case: risk of loss, indemnity and warranty. "Risk of loss" means, as between the two parties to the contract, who will have to pay in the event the property is destroyed, whether by negligence, an act of god, or by intention. However, mere allocation of risk of loss does not fully encompass the parties' potential obligations. The next potential source of financial concern to the parties to the contract is potential liability to someone outside the contract, who is damaged during the contract's performance. Who pays for this liability is determined by the duty of indemnity. Finally, the third factor is warranty: what guarantee does the builder give the buyer that the product will perform after it is delivered; that it is not defective.

The crux of the problem is that the Plaintiff would have the Court believe there are two contract provisions covering property loss due to a defective product: one in the warranty clause (Builder warrants the work to be free of all defects and materials for one year) and a second in the indemnity clause (Builder agrees to indemnify Owner against all loss). Since the warranty period expired, the Plaintiff argues that the property loss is covered under the indemnity article. However, the warranty covers property loss after delivery, while the indemnity provision covers liability for third party claims—two entirely separate contractual duties.

To construe the indemnity language as encompassing simple property loss occurring after delivery renders the warranty limitation meaningless. As cited in Houma Fabricator's original brief, the general rules governing the construction of contracts will

apply when interpreting a contract of indemnity.[22] The Civil Code requires that a provision susceptible of having different meanings must be interpreted with a meaning that renders it effective.[23]  To interpret the indemnity provision as covering property loss for more than one year after delivery renders the warranty provision ineffective.    Therefore, a reasonable interpretation of the contract requires the terms "indemnity" and "warranty" to be defined differently.  As Houma Fabricators has previously asserted, the warranty is a limited guarantee that the product will be sound, and will be replaced or repaired if not. The indemnity protects the vessel owner against claims made by third parties in the event that a defect in the product causes harm to a third party or a third party's property.  To construe these provisions as both meaning the same—a remedy for loss of the property itself—is to render one provision irrelevant and ineffective, contrary to the Civil Code.

The Shipbuilding Contract cannot be interpreted to mean that an indemnity obligation for property damage is indefinite while the warranty against property damage extends for only one year.  As explained at oral argument, the contract was structured so that prior to the delivery of the vessel, all risk of property loss remained with Houma Fabricators.[24]  This risk of loss was protected with builder's risk insurance.  Upon delivery and acceptance, all risk of property loss transferred to the shipowner.[25]  At delivery, the vessel was warranted to be free of defects in materials or workmanship for a period of one year.[26]  After expiration of the warranty, no further obligation existed.

---

[22] *Soverign Insurance Company v. Texas Pipeline Company*, 488 So.2d 982, 984 (La. 1986).
[23] LSA-C.C. art. 2049.
[24] Shipbuilding Contract Article VI.
[25] Shipbuilding Contract Article IX.
[26] Shipbuilding Contract Article XII.

In Louisiana, a court is able to construe an indemnity agreement in light of everything that by law, custom, usage or equity, is considered incidental to the contract in question when necessary to carry it into effect.[27]  One of the factors in determining a party's intent to shift the risk of loss to another party to the contract is the requirement of insurance.[28]  The type of insurance the contract requires to be supplied is indicative of the scope of indemnity required by the contract.[29]  For example, in *Day v. Ocean Drilling & Exploration Co.*, the district court examined an indemnity agreement that required a subcontractor to indemnify a drilling contractor against all risks of harm to the subcontractor's employees while they were on the drilling platform.[30]  The subcontractor's employee was injured when a compressor owned by the drilling contractor blew up.  The drilling contractor sought indemnity for the personal injury claim from the subcontractor, even though the sub was not at fault.  The court found that the contract and the insurance scheme reflected an intention to indemnify the driller for all risks of harm, regardless of fault.  The language of the indemnity language was broad and expansive, and the contract required the sub to carry workers' comp, employer's liability, CGL, and contractual liability and indemnity coverage.[31]  Essentially, the court determined that the subcontractor's insurance scheme paralleled its contractual obligations.

In the present case, the Shipbuilding Contract shows that, in regards to property damage, Houma Fabricators was only required to furnish a builders' risk policy for the time period encompassing <u>construction</u>.  As previously discussed in the Motion for Summary

---

[27] *Soverign Insurance Co.*, 488 So.2d at 985.

[28] *McKinney v. South Central Bell Telephone Co.*, 590 So.2d 1223 (La. App. 1st Cir. 1991).

[29] *Day v. Ocean Drilling & Exploration Co.*, 353 F.Supp. 1350, 1353 (E.D. La. 1973).

[30] *Id.* at 1351.  Note: this is a pre-Louisiana Oilfield Anti-Indemnity Act case.

14

Judgment, a builders' risk policy provides coverage for the loss of the property during construction. It terminates at the completion of construction and delivery of the property. Houma Fabricators' Builder's Risk Policy, which also included hull & machinery and P&I coverage for any delivery voyage, states that the duration of risk was from January 15, 1996 through January 15, 1997 "or until delivery."[32] The policy then had to be extended by endorsement so it would cover the vessel through the anticipated completion date.[33] As previously addressed, CGL coverage was required by the Shipbuilding Contract, but "liability" insurance only covers claims made by third parties against the insured. Therefore, Houma Fabricators was not obliged to furnish insurance to cover property damage to the insured's own property occurring after the delivery of the vessel. This insurance scheme demonstrates that Houma Fabricator's has no contractual obligation to "indemnify" Seacor for property damage occurring after delivery. With the exception of the warranties, Seacor assumed all risk of loss after delivery as required by the contract and as provided by the law of obligations and the Civil Code.

Since the hearing on the Motions for Summary Judgment, further investigation was conducted into the circumstances surrounding the drafting of the Shipbuilding Contract. The Court may recall that counsel for Seacor asserted that the Shipbuilding Contract was a Houma Fabricators standard form, that the indemnity language in the Shipbuilding Contract was supplied by Houma Fabricators and, accordingly, the language must be construed against the drafter for purposes of contract construction. It now appears that the present indemnity language may have been supplied by Seacor just before the

---

[31] Id. at 1352-3.

[32] Exhibit 2, p. 18.

15

execution of the final contract in May 1996. Presently, further investigation/discovery is being conducted. Therefore, contrary to what counsel for Seacor urged at the hearing, it may be that this indemnity language should not be construed this language should not be construed against Houma Fabricators, but against Seacor pursuant to Civil Code Article 2056. This development puts the entire indemnity issue into a new light and will be the subject of further discovery and comment.

At the hearing, the Court noted that Article XVII B, Insurance and Indemnity, provides a caveat that "notwithstanding any transfer of title as a result of OWNER'S periodic payments as provided in Article III hereinabove and the transfer of title as provided in Article VI hereinabove, BUILDER hereby agrees to indemnify, defend and hold harmless OWNER . . . from and against any and all claims . . . ." In Section C of this memorandum, it was explained that despite the passage of title, risk of loss remained with Houma Fabricators until delivery of the vessel. This contract language quoted above simply affirms that even though the risk of the loss of the property had not yet transferred to Seacor, the liability for some third party claims remained with Houma Fabricators. Further, this indemnity language divides the liability for third party claims between the two parties to the contract: Seacor is liable for claims attributable to its own negligence, its subcontractors' negligence or unseaworthy conditions arising after delivery; Houma Fabricators is liable for third party claims related to it's own work or that of its subcontractors.

Neither does this language mean that a duty to reimburse Seacor for property damage survives final delivery of the vessel. The transfer of title in Articles III and VI relate

---

[33] Exhibit 2, pp. 14-16, Endorsements 2,3 and 4.

to progress payments causing a transfer of title so that the property is not subject to attachment by Houma Fabricators' creditors prior to delivery, among other reasons. Further, the articles regarding passage of title reserve the risk of loss or damage to Houma Fabricators despite the transfer of title.   Just as the transfer of title provision does not relieve Houma Fabricators of the risk of loss, so does the indemnity provision preserve Houma Fabricators' duty to indemnify Seacor for certain third party claims despite the transfer of title of the component parts or delivery of the vessel.  Therefore, transfer of title does not affect the indemnity obligation.  The indemnity language has no relation to first party claims; that is handled solely within the warranty provisions.

The Court also questioned the possible interpretations of another portion of the indemnity clause:  "Further, builder shall not be required to defend, hold harmless and indemnify owner for any claims caused solely by an unseaworthy condition which occurs after the delivery provided for in Article IX."[34]  The Court questioned whether this language could be construed to mean that the indemnity obligation continued beyond the point of delivery for claims not solely caused by an unseaworthy condition.   However, as remarked above, this language relates to claims made by third parties, not the division of risk of loss between the parties to the contract.  Accordingly, the language should be read in context with the next sentence:  "This shall not in any way affect any of the warranty provisions set forth in Article XII hereinabove."  Note that the warranty provision disclaims any liability for consequential damages, which would include unforeseeable third party product liability claims.   Read together, the final two sentences of Article XVII(B) demonstrate a limitation on liability for third party claims due to unseaworthy conditions

occurring after delivery of the vessel, no more. In any event, it appears now that the indemnity language was drafted by Seacor and any ambiguity in the meaning of the clause should be construed in favor of Houma Fabricators and against Seacor.

The Court also inquired whether Houma Fabricators was required to indemnify Seacor because the damage was caused by an unseaworthy condition which "occurred" prior to delivery. The argument being that the vessel was unseaworthy when the hose was installed, but the condition did not manifest itself until the fire. First, the indemnity duty only relates to third party claims against the vessel owner for damages caused to those third parties by the unseaworthy condition. If a crewman had been injured in the fire as a result of a defective hose, that would be the case. If the vessel had run into the platform when the engine failed due to the fire, that would be an indemnity claim. However, the loss of the property itself is a claim sounding in breach of warranty, as recognized by the *East River* Court. Accordingly, one must look to the warranty coverage, which had expired by that time. The warranty only applied to defects "discovered within one year of delivery", and was no longer operative[35]

Regardless of semantics and what real indemnity duties may or may not arise as a result of this provision, the language of the final sentence of the indemnity provision demonstrates that Seacor is limited to a claim in express warranty for any property loss resulting from defects discovered within one year after delivery. The present instance is not a third party claim for which indemnity lies. It is merely an out of time warranty claim

---

[34] Art. XVII; Art. IX provides that risk of loss transfers to the owner upon delivery.
[35] Shipbuilding Contract Article XII.

Seacor is attempting to bootstrap into indemnity by virtue of language it drafted and inserted into the contract.

Accordingly, the plaintiff's argument that the indemnity duty relates to damage to the property itself, lasts for all time and is without limitation is simply an incoherent construction of the contract. Rather, all risk of loss had passed to Seacor at the expiration of the warranty.

### E.    Any claim for breach of warranty has prescribed.

At hearing on the Motions for Summary Judgment, it was conceded by Seacor that any claim for breach of the express warranties had prescribed. However, in its Amended Complaint the Plaintiff alleged a breach of an implied warranty pursuant to Louisiana Civil Code Article 2524. This article relates to a warranty of fitness for a product's ordinary use and is contained in the Civil Code section on redhibition, under Title VII--Sale. Because this litigation arises from the alleged breach of a shipbuilding contract, the sales article is inapplicable and no implied warranty is available to the plaintiff under the sales articles. Instead, Seacor negotiated for and received a full one year express warranty instead of the typical six month express warranty that Houma Fabricators usually supplied in its contracts. Houma Fabricators' express warranty was even more generous in scope than the implied warranty supplied by the sales articles. The express warranty provided not only that the product would be fit for the purpose for which it was intended, but that it would conform to the requirements of the plans and specifications, be of first class workmanship and quality, and be free of all defects in material and workmanship.[36] The express warranty further provided that any defects "discovered" within one year after

19

delivery would be corrected by the builder. Clearly, this was a more generous and expansive warranty than that pursued by the plaintiff under his sales/redhibition theory. Unfortunately for the Plaintiff, that warranty expired one year after delivery. Because the Shipbuilding Contract is an agreement to build that is not subject to the redhibition warranties, the plaintiff has no cause of action based on an implied warranty under Article 2524 and this final claim should be dismissed with prejudice.

## III.    CONCLUSION.

The above and foregoing amply demonstrates that Seacor will not be able to show at trial that it has any viable cause of action against Houma Fabricators based on any theory of recovery. Houma Fabricators is a shipbuilder, whose product is not subject to the redhibition articles applicable to sales of goods. The duty of indemnity only applies with respect to claim by third parties for negligence or property loss. Any claim for maritime tort is expressly barred by the *East River* doctrine, and the stern-thruster does not constitute a vessel owner's "other property" for which recovery against a shipbuilder is allowed. Finally, the sales warranties are not applicable to a shipbuilding contract. The Motion for Summary Judgment filed by Houma Fabricators should therefore be granted and the First Supplemental and Amended Complaint filed by Seacor should be dismissed with prejudice.

Respectfully submitted

---

[36] Shipbuilding Article XII.

_(signature)_

RONALD A. JOHNSON, T.A. (#7329)
ROBERT H. WOOD (#23598)
JOHNSON, JOHNSON, BARRIOS & YACOUBIAN
One Shell Square,
701 Poydras Street, Suite 4700
New Orleans, Louisiana 70139-7708
Telephone (504) 528-3001
Attorneys for Houma Fabricators,
A Division of LOR, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon all counsel of record, either by hand delivery, facsimile, or by placing the same in the United States mail, properly addressed and postage prepaid, this 22nd day of March, 2001.

_(signature)_

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED